# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# WESTERN DIVISION

|   |   |   |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 7 |
| TAMARA SARA PARVIZI, | ) | Case No. 18-30578-EDK |
| | ) | |
| Debtor | ) | |
| | ) | |
| TAMARA SARA PARVIZI, | ) | Adversary Proceeding |
| | ) | No. 19-3003 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| EDUCATION, GREAT LAKES | ) | |
| BORROWER SERVICES, | ) | |
| Defendants | ) | |

## AMENDED MEMORANDUM OF DECISION

Before the Court, after trial, is a *pro se* complaint filed by Tamara S. Parvizi, the debtor in the underlying Chapter 7 bankruptcy case (the "Debtor"), against the United States Department of Education (the "DOE") and Great Lakes Borrower Services ("Great Lakes"). Through this adversary proceeding, the Debtor seeks a declaration that various student loans held by the DOE should be discharged pursuant to § 523(a)(8) of the United States Bankruptcy Code,[1] as excepting

---

[1] *See* 11 U.S.C. §§ 101 *et al.* (the "Bankruptcy Code" or the "Code." All statutory references are to provisions of the Bankruptcy Code unless otherwise stated. All references to the "Bankruptcy Rules" are to the Federal Rules of Bankruptcy Procedure. References to the "Federal Rules" are to the Federal Rules of Civil Procedure.

1

the loans from discharge would impose an undue hardship on the Debtor.[2] The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(b) and D. Mass. Local Rule 201, and has the authority to enter a final judgment, 28 U.S.C. §§ 157(b)(1). *See also* 28 U.S.C. §157(b)(2)(I). The following constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

I. <u>FACTS AND TRAVEL OF THE CASE</u>

The factual findings contained in this Memorandum are based on trial testimony, the parties' joint pretrial stipulation, the admitted evidence, and the Court's own records.[3] *See LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.),* 196 F.3d 1, 8 (1st Cir. 1999).

As of the trial date, the Debtor was 51 years old, had no physical or mental conditions that impede her ability to work, and did not have (and never has had) any dependents. From 1997 through 2012, the Debtor received various student loans to fund her extensive education. As a result of that education, the Debtor has obtained multiple degrees and is fluent in at least four languages.[4]

---

[2] Great Lakes has not filed an answer or otherwise appeared in this adversary proceeding. However, the parties have stipulated that although Great Lakes disbursed funds to the Debtor pursuant to 2 student loan promissory notes, those loans were later sold to the DOE. Accordingly, the Court will separately issue an order to show cause why Great Lakes should not be dismissed as a defendant inasmuch as it appears they are not a proper party to this adversary proceeding.

[3] As a result of the dangers presented by the COVID-19 pandemic, in accordance with Federal Rule 43(a), made applicable by Bankruptcy Rule 9017, compelling circumstances existed that constituted good cause to require that all aspects of the trial proceed by video transmission rather than in person. On September 29, 2020, a trial was conducted by video using the Zoom.gov videoconferencing platform. The Debtor was the only witness.

[4] The Debtor's resume indicates that she is fluent in English, French, Spanish, Persian, and Turkish. Pl. Ex. A. At her deposition, a transcript of which was admitted into evidence, the Debtor questioned her current fluency in Turkish.

In 1990, the Debtor obtained a bachelor's degree in philosophy and biochemistry from Clark University. Thereafter, she attended medical school at the University of Rochester School of Medicine from 1991 to 1995 but voluntarily left before receiving a degree. In 1997, the Debtor enrolled in a graduate program at University of Massachusetts Amherst and received a master's degree in public health in 1999.

Following the receipt of her master's degree, the Debtor worked as an assistant program director for a community health organization in Worcester, Massachusetts, earning an annual salary of between $30,000 and $40,000. She left that position after approximately six months to take a position as the director of a public health program affiliated with UMass Medical Center, where she earned approximately $50,000 per year. She left that director position after six months because, according to the Debtor, she was not committed to the organization's mission.

After leaving, the Debtor applied for some positions in public health within Massachusetts, but ultimately decided that she was more interested in teaching and was no longer interested in public health administrative positions, because the Debtor's "interest is in mind/body and in working with people that way." Def. Ex. K, Dec. 19, 2019 Dep. Tr. ("Dep. Tr.") 18:4-7. The Debtor acknowledged that, with regard to employment, "there are some compromises you have to make along the way," but she was unwilling to make those compromises. Dep. Tr. 18:8-11.

Until 2008, the Debtor assisted her father with his medical issues, pursued her artistic interests, performed odd jobs, and did some teaching. In 2007, the Debtor received $100,000 from her father and offered to compromise her extant $123,000 student loan balance for $45,000. The Debtor informed the DOE that "what it comes down to is this: whether I choose to live my life within or outside the United States." Def. Ex. A. The DOE rejected the offer because, based on the Debtor's financial statement, the DOE believed that the Debtor had an ability to pay the loan.

3

The Debtor did not use any of the funds to pay down the student loan balance and has since spent the entire $100,000.

In 2008, the Debtor returned to medical school at St. George's University School of Medicine (financed by additional student loans) and graduated with a Doctor of Medicine in 2012. In June 2012, the Debtor began a four-year residency program in psychiatry at the University of Vermont ("UVM"), earning $50,000 per year. But the Debtor did not complete the residency program and left in January 2013.

At trial and during her deposition, the Debtor repeatedly blamed her current financial circumstances and inability to make payments on her student loans on the termination of her residency. The Debtor testified that, as a result of a conflict with her supervisor, the Debtor was put on a remediation plan and was then placed on leave pending an appeal. According to the Debtor, she "begged" the supervising doctor to let her finish out the year, and testified that "the fact that she would not let me finish the year really closed a lot of doors for me." Dep. Tr. 48:8-9, 19-20. The Debtor says that, as she was waiting for the resolution of her appeal, she decided not to attempt to find another residency match during that period because she was hoping for "a positive result . . . rather than risk not only a negative outcome but a prejudicial report." Trial Tr. 34:21-35:7, Sept. 29, 2020 ("Trial Tr."). The Debtor characterized the damage caused by not trying for a residency spot at that point as "a direct consequence of not having had an appeal on time." Trial Tr. 35:9-10. But elsewhere in her testimony, the Debtor admitted that she decided not to pursue the appeal and, instead, chose to resign. Her voluntary resignation from the residency program was noted in a letter of reference given to the Debtor from UVM in April 2013, which *inter alia*, acknowledged that the Debtor had successfully completed 6 clinical rotations. Pl. Ex. E.

4

Following her resignation, the Debtor maintains that she continued to search for residencies in psychiatry, family medicine, and pathology, that she has "knocked on every door," Trial Tr. 36:25, 51:25, and that she has "made every effort to recover my profession . . . and in the process obviously to be able to pay back these student loans." Trial Tr. 51:25-52:2. While her primary focus had been on obtaining a residency in psychiatry, the Debtor also shadowed pathology department attendees at Holyoke Health Center and the Emily Dickinson Hospital to prepare for potential interviews for family medicine or pathology residency programs. Despite her many attempts, the Debtor was never offered an interview for, nor admitted to, another residency program.

Since 2014, the Debtor has primarily obtained employment in the education field. She has taught as an adjunct professor at community colleges and has worked as a tutor, as a teacher for the North American Hockey Association, and as a per diem substitute high school teacher. For tax years 2016 through 2019, the Debtor's annual income was $21,588, $20,876, $41,336, and $28,668, respectively. The Debtor estimated that she earned $2,500 per month in early 2020. From April through August 2020, the Debtor collected $5,781 in unemployment compensation benefits and earned $3,500 teaching an online class, for a total monthly income of approximately $1,900. At the time of trial, the Debtor was working as an adjunct professor at the Massachusetts College of Pharmacy and Health Science earning an estimated $3,400 per month and had not yet secured employment for the spring of 2021.

When asked whether she has sought employment that would utilize her medical degree, the Debtor testified that she had applied for jobs as a research program coordinator in 2013 and 2014, but was dismissive of other potential opportunities in the medical field. She testified: "I mean, I could've been a phlebotomist. I could've been, I guess, you know, done medical assisting.

5

I mean, what's the point though? I mean, it just seemed sort of a more dignified way of using my knowledge to teach anatomy and physiology and continue knocking on these doors," Dep. Tr. 49:9-14, and emphasized her focus on obtaining employment in education: "I feel like I'm making a positive contribution . . . and I feel like I've suffered enough of a loss that I deserve a sense of dignity in terms of knowing that I'm doing something that's – that I consider worthwhile." Trial Tr. 46:21-47:7. The Debtor further testified that she has not sought additional part time work outside the medical and educational fields because she felt like she had "been knocked down enough. That's enough." Dep. Tr. 53:21-54:2.

As evidenced by her employment record since leaving her residency, the Debtor has not been focused on maximizing her income, but rather has decided to focus on obtaining employment in the educational field – "I decided, you know what? I think – I think, if anything, I'm a better teacher than anything else. I have a lot of knowledge. And that's what I enjoy doing." Dep. 46:1-4. At trial, the Debtor reiterated that she "didn't go into medicine to make money," Trial Tr. 47:8-11, and testified that it didn't matter to her how much money she made, so long as she was able to "live more or less comfortably." Trial Tr. 47:21-24.

At the time of trial, the Debtor's expenses approximated $1,600 per month and included rent - $800; storage unit - $85; car insurance - $108; renter's insurance - $45; cell phone - $60; groceries - $300; and discretionary expenses - $200. Her car payment of $320 per month had recently been eliminated because the Debtor had paid off the loan. The Debtor stipulated that her discretionary income has fluctuated between $400 and $1,800 per month and testified that she has not saved any of it. To the contrary, the Debtor agreed that from June through August 2019 she spent $1,500 at clothing stores, household gift shops, and on Etsy.com and spent over $900 on coffee, eating out, and Amazon and PayPal purchases.

The DOE holds two types of the Debtor's student loans – federal government funded loans through the William D. Ford Federal Direct Loan Program (the "Direct Loans") and privately funded student loans that are guaranteed and held by the federal government through the Federal Family Education Loan Program (the "FFELP Loans"). As of September 10, 2020, the outstanding total balance of the Direct and FFELP Loans totaled $653,843.22, comprised of $478,070.53 in unpaid principal and $175,772.80 in interest. The Debtor has not made any payments toward the student loans with the exception of offsets of her income tax refunds in the amount of $3,960.95, which were credited to her student loan account.

The parties have stipulated that the Direct Loans are currently eligible for participation in the Revised Pay As You Earn ("REPAYE") income-driven repayment plan, and that the FFELP Loans would also be eligible upon consolidation. Under the REPAYE program, a borrower's aggregate monthly loan payment is limited to ten percent of the amount by which the borrower's adjusted gross income exceeds 150% of the federal poverty guideline applicable to the borrower's family size divided by 12. If a borrower earns less than 150% of the poverty level for their household size, the payment will be $0. If the borrower participates in the REPAYE program (even if the monthly payment is $0) for 20 years for undergraduate and 25 years for graduate loans, the entire loan, including accrued interest, is forgiven and the DOE cancels the debt. The REPAYE payment is recalculated annually based on a borrower's prior year's federal tax return, or current income if the most recent tax information does not accurately reflect a borrower's prior year's earnings. If a borrower elects to participate in REPAYE, then they must sign a consent form authorizing the disclosure of the borrower's tax information and must recertify the borrower's family size on an annual basis. Using an estimated Adjusted Gross Income of $28,668 (the Debtor's reported income in 2019), the Debtor's payment under the REPAYE program at the time

7

of trial would have been $80 per month.

The Debtor was previously enrolled in an income-based repayment plan with a monthly payment of $0 for twelve months beginning in September 2014. However, her enrollment ended after the Debtor failed to recertify her income. The Debtor now says that she is "unwilling" to participate in an income-based repayment plan, Trial Tr. 45:23-25, because she "realized why should I pay for the mistakes of a residency program director whose behavior has cost me my life, my pursuit of happiness. Let's put it that way. Why should I pay for that person's mistake?" Trial Tr. 53:1-4. Despite the clear evidence that the Debtor's discretionary income exceeded $80 per month, she testified that she cannot afford to pay $80 per month toward the student loans. And when questioned whether she spends more than $80 per month on discretionary purchases, she responded: "I can't answer that question." Trial Tr. 46:4-5, 12. In short, with regard to the Debtor's willingness to participate in any type of income based repayment program, the Debtor concluded: "You know, it's always kind of been on the horizon. But, the thought of doing without the last – you know, just a few dollars of the little bit discretionary funds that I have, has been just like, no. Like just no. Absolutely not. I've suffered enough." Dep. Tr. 70:7-14.

II. POSITIONS OF THE PARTIES

The vast majority of the Debtor's testimony was dedicated to persuading the Court that she was "forced out of [her] residency program under highly questionable circumstances, thereby not only cutting short [her] medical career, but also placing [her] in a position of being both under and over qualified to do very little else, except to teach at a level of subsistence." Summary Statement, Joint Pretrial Memorandum, Ex. 1. The Debtor argues that this Court should relieve her from paying her student loans because of the "gross misconduct and injustice" inflicted upon her by

8

UVM and suggested that maybe UVM should pay on her behalf. *Id.* She maintains that her situation is analogous to situations where, the Debtor says, the DOE forgives loans that have been taken out by students who did not get the education they paid for, and believes there "is a law on the books for excusing payment of student loans based on whether you've been bamboozled out of your education . . . ." Trial Tr. 48:17-22.

The DOE says that, when looking at the totality of the circumstances, the Debtor's focus on her residency program is misplaced and that the Debtor has not demonstrated that repayment of her student loans would constitute an undue hardship within the meaning of § 523(a)(8). The DOE emphasizes the Debtor's multiple advanced degrees, her lack of any physical or mental impediments to employment, and her failure to maximize her income in order to repay the loans. In addition, the DOE argues that the Debtor has demonstrated an ability to maintain more than a minimal standard of living and has a history of discretionary monthly income that is more than sufficient to make payments under the REPAYE program. With regard to the Debtor's inability to become licensed to practice medicine, the DOE contends that it was the Debtor's choice to use student loans to fund her education and in doing so she voluntarily assumed additional student loan debt. According to the DOE, "if Congress intended to make the repayment of student loans contingent on certain events, it would have done so." Trial Tr. 56:10-12.

III. <u>DISCUSSION</u>

Section 523(a)(8) provides that student loan debts are excepted from a debtor's bankruptcy discharge "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents[.]" 11 U.S.C. § 523(a)(8). The debtor bears the burden of proving such undue hardship by a preponderance of the evidence. *Lorenz v. Am. Educ.*

9

*Servs./Penn. Educ. Assistance Agency (In re Lorenz)*, 337 B.R. 423, 430 (B.A.P. 1st Cir. 2006).[5] In seeking to discharge student loans, a debtor "has a formidable task, for Congress has made the judgment that the general purpose of the Bankruptcy Code to give honest debtors a fresh start does not automatically apply to student loan debtors. Rather, the interest in ensuring the continued viability of the student loan program takes precedence." *Nash v. Conn. Student Loan Found. (In re Nash)*, 446 F.3d 188, 191 (1st Cir. 2006). "For this reason, discharges for undue burden are granted in only 'truly exceptional circumstances.'" *Murphy v. Educ. Credit Mgmt. Corp.,* 511 B.R. 1, 4 (D. Mass. 2014) (quoting *Fed. Credit Union v. DelBonis,* 72 F.3d 921, 927 (1st Cir. 1995)).

Although "undue hardship" is not defined in the Bankruptcy Code, the parties have stipulated that the test to be applied in this case is the "totality of the circumstances" test, which this Court, along with the other bankruptcy courts in this district, has previously adopted. *See Schatz v. U.S. Dept. of Educ. (In re Schatz)*, 584 B.R. 1, 7 (Bankr. D. Mass. 2018), *vacated and remanded on other grounds,* 602 B.R. 411 (B.A.P. 1st Cir. 2019). The focus of the Court in determining whether a debtor has established undue hardship under § 523(a)(8) is not on whether the debtor's student-loan funded education yields any particular result the debtor anticipated or hoped for. "All bargains contain risks, and it is for each borrower to determine 'whether the risks of future hardship outweigh the potential benefits of a deferred-payment education.'" *Murphy*, 511 B.R. at 6 (quoting *Brunner v. N.Y. St. Higher Educ. Servs. Corp. (In re Brunner)*, 46 B.R. 752, 756 (S.D.N.Y. 1985), *aff'd* 831 F.2d 395 (2d Cir. 1987)).

---

[5] Technically, the initial burden is on the creditor to "demonstrat[e] that the debt exists and that the debt is of the type excepted from discharge under § 523." *Lorenz,* 337 B.R. at 430 (citing *Educ. Credit Mgmt. Corp. v. Savage (In re Savage)*, 311 B.R. 835, 838-39 (B.A.P. 1st Cir. 2004)). Here, there is no dispute that the student loans in question exist and are of the type contemplated by § 523.

10

Instead, the totality of the circumstances analysis is aimed at determining the answer to the question: "Can the debtor now, and in the foreseeable future, maintain a reasonable, minimal standard of living for the debtor and the debtor's dependents and still afford to make payments on the debtor's student loans?" *Hicks v. Educ. Credit Mgmt. Corp. (In re Hicks)*, 331 B.R. 18, 31 (Bankr. D. Mass. 2005).

> In answering this question, the Court should consider all relevant evidence—the debtor's income and expenses, the debtor's health, age, education, number of dependents and other personal or family circumstances, the amount of the monthly payment required, the impact of the general discharge under chapter 7 and the debtor's ability to find a higher-paying job, move or cut living expenses. In addition, other factors not listed here may impact a particular debtor's case.

*Id*. In determining a debtor's ability to pay, courts look not only at a debtor's current circumstances, but also at the potential for the debtor to increase or maximize future income. *Id.*[6] In addition, a debtor's eligibility to participate in an income-contingent repayment plan is a factor to be considered under the totality of the circumstances test. *Smith v. U.S. Dept. of Educ. (In re Smith)*, 499 B.R. 55, 64 (Bankr. D. Mass. 2013).[7]

Here, the Debtor is highly educated, has no dependents, suffers from no physical or mental conditions that impede her ability to work, and, at age fifty-one, likely has many more years of being able to productively work before retirement.

While the Debtor attempted to place the blame for her inability to make payments on her student loans upon her uncompleted residency program and at several points stated that she had

---

[6] *See also, e.g., Brunell v. Citibank (South Dakota) N.A. (In re Brunell)*, 356 B.R. 567, 578 (Bankr. D. Mass. 2006); *Joyce v. Mountain Peaks Fin. Servs, Inc. (In re Joyce)*, 342 B.R. 385 (B.A.P. 1st Cir. 2005); *Smith v. Educ. Credit Mgmt. Corp. (In re Smith)*, 328 B.R. 605, 611 (B.A.P. 1st Cir. 2005).

[7] *See also Ayele v. Educ. Credit Mgmt. Corp. (In re Ayele)*, 468 B.R. 24, 35 (Bankr. D. Mass. 2012), *aff'd* 490 B.R. 460 (D. Mass. 2013); *Stevenson v. Educ. Credit Mgmt.Corp. (In re Stevenson)*, 463 B.R. 586, 597 (Bankr. D. Mass. 2011) *aff'd,* 475 B.R. 286 (D. Mass. 2012); *Sanborn v. Educ. Credit Mgmt. Corp. (In re Sanborn)*, 431 B.R. 5, 10-11 (Bankr. D. Mass. 2010).

"knocked on every door," she has also acknowledged that a substantial barrier toward repayment has been her own lack of motivation to increase her earnings – "[r]ealistically, there is no way I can make a dent in this given my lack of ambition for making money." Dep. Tr. 82:11-26. Simply put, while the trajectory of her medical residency experience was not ideal, the Debtor has not shown any effort to maximize her income based on her education and marketable skills. The Debtor may not have the willingness, but she certainly has the capability, to find a higher-paying job that would better exploit her education and experience or to supplement her income with additional part-time work. *See Joyce*, 342 B.R. 385 (debtor who argued his medical degree was not marketable because debtor had not completed residency and had left the medical field several years ago did not prove that he had "exhausted all opportunities available to someone with his educational background and professional experience").[8]

However, common sense leads the Court to conclude that, with over $650,000 in outstanding student loan debt, the monthly payment amount outside of an income-based repayment program would likely be insurmountable even were the Debtor to maximize her income. But the Debtor's ability to participate in the REPAYE program weighs heavily against the Debtor's argument that repayment of the student loans would impose an undue hardship. The evidence presented at trial, and stipulated to by the Debtor, demonstrates that the Debtor has consistently had monthly discretionary income sufficient to make the estimated $80 per month payment towards her student loans under the REPAYE program. In fact, based on the evidence presented, the Court finds that the Debtor has consistently had *more* than sufficient discretionary income to

---

[8] *See also Bloch v. Windham Prof'ls (In re Bloch)*, 257 B.R. 374, 378 (Bankr. D. Mass. 2001) (debtor did not prove that prospects for increasing future income were so bleak as to warrant discharge of student loans where debtor was highly educated, was not hindered by any physical or mental disability or need to care for any dependents, could increase hours worked per week and/or find part-time employment, and could enhance future income by better exploiting educational credentials and job skills).

allow the Debtor to comfortably participate in an income-based repayment program, despite any protestations to the contrary.

In sum, based on the totality of the circumstances, the Debtor has not proven by a preponderance of the evidence that excepting her student loans from discharge would impose an undue hardship pursuant to § 523(a)(8). However, the Court does find that to the extent the Debtor is unable to repay the student loans in full by the end of any applicable income-contingent repayment program, the negative amortization of the debt and accrued interest would undoubtedly constitute an undue hardship to the Debtor at that time. The Debtor was 51 years old at the time of trial and will be in her mid to late 70's by the time she completes an income-based repayment plan. And while the DOE states that any remaining balance on the student loans will be forgiven upon the completion of the REPAYE program, the potential tax consequences of that forgiveness "at the end of one's working life would be a tremendous undue hardship as the result of the student loan." *Brunell*, 356 B.R. at 580-81; *see also Stevenson*, 463 B.R. at 599; *Ayele*, 468 B.R. at 36.

Accordingly, judgment will enter for the DOE, except that pursuant to § 105(a), the Court will order that any student loan debt remaining unpaid upon the Debtor's completion of the REPAYE program or any comparable program is deemed discharged as an undue hardship pursuant to § 523(a)(8).

IV. CONCLUSION

For all the forgoing reasons, the Court will enter judgment in favor of the DOE, except that any student loan debt currently held by the DOE that remains outstanding upon the Debtor's completion of payments under the REPAYE program or any similar income-based repayment program is deemed discharged pursuant to 11 U.S.C. § 523(a)(8). In the event the Debtor is not

13

eligible for the REPAYE or similar program, the judgment will be without prejudice to the Debtor's right to file a renewed request for discharge of the student loans and a review of the Debtor's situation. *Sanborn*, 431 B.R. at 11–12. A judgment in conformity with this Memorandum will issue forthwith.

DATED: May 13, 2021                     By the Court,

                                                    Elizabeth D. Katz
                                                    United States Bankruptcy Judge