**APPEAL, AddChg**

# United States Bankruptcy Court
## District of Massachusetts (Springfield)
## Adversary Proceeding #: 19−03003

*Assigned to:* Judge Elizabeth D. Katz                    *Date Filed:* 01/30/19
*Lead BK Case:* 18−30578
*Lead BK Title:* Tamara Sara Parvizi
*Lead BK Chapter:* 7
*Demand:*
  *Nature[s] of Suit:*   63 Dischargeability − 523(a)(8), student
                            loan

### Plaintiff
——————————————————

**Tamara Sara Parvizi**          represented **Tamara Sara Parvizi**
416 William S. Canning Blvd          by PRO SE
#1007
Fall River, MA 02721
802−355−5679
SSN / ITIN: xxx−xx−6509

V.

### Defendant
——————————————————

**U.S. Department of**          represented **U.S. Department of Education(Great Lakes Borrowers)**
**Education(Great Lakes**          by PRO SE
**Borrowers)**
33 Arch Street #300
Boston, MA 02110

### Defendant
——————————————————

**Great Lakes Borrower Services**          represented **Great Lakes Borrower Services**
P.O. Box 7860          by PRO SE
Madison, WI 53707

### Defendant
——————————————————

**Department of Ed c/o General**
**Counsel to Secretary of**
**Education**
400 Maryland Ave SW
Washington, DC 20202

### Defendant

1

_____

| **U.S. Department of Education** | represented | **Erin Brizius** |
|---|---|---|

by DOJ−USAO D Mass
One Courthouse Way
Suite 9200
Boston, MA 02210
Email: erin.e.brizius2@usdoj.gov

**Raquelle Kaye**
US Attorney's Office District of Mass
John Joseph Moakley Federal Courthouse
1 Courthouse Way
Suite 9200
Boston, MA 02210
617−748−3403
Email: raquelle.kaye@usdoj.gov

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 01/30/2019 | | 1 | Adversary case 19−03003. Complaint by Tamara Sara Parvizi against U.S. Deptartment of Education. (cl) (Entered: 01/31/2019) |
| 01/31/2019 | | 2 | Summons Issued on U.S. Department of Education. Answer Due 3/4/2019. Summons must be served within seven (7) days of issuance. (cl) (Entered: 01/31/2019) |
| 01/31/2019 | | 3 | Court Certificate of Mailing Re: 2 Summons Issued. (cl) (Entered: 01/31/2019) |
| 03/05/2019 | | 4 | Summons Service Executed on Great Lakes Borrower Services 2/2/2019. (cl) (Entered: 03/05/2019) |
| 04/15/2019 | | 5 | Notice to Add Defendant Re: 1 Complaint filed by Plaintiff Tamara Sara Parvizi. (cl) (Entered: 04/16/2019) |
| 04/16/2019 | | 6 | Summons Issued on Great Lakes Borrower Services. Answer Due 5/16/2019. Summons must be served within seven (7) days of issuance. (cl) (Entered: 04/16/2019) |
| 04/16/2019 | | 7 | Court Certificate of Mailing Re: 6 Summons Issued. (cl) (Entered: 04/16/2019) |
| 04/25/2019 | | 8 | Summons Service Executed on U.S. Department of Education.(cl) (Entered: 04/25/2019) |
| 05/06/2019 | | 9 | Motion filed by Plaintiff Tamara Sara Parvizi Withdraw Defendant U.S. Department of Education. (cl) (Entered: 05/06/2019) |
| 05/08/2019 | | 10 | Endorsed Order dated 5/8/2019 Re: 9 Motion filed by Plaintiff Tamara Sara Parvizi Withdraw Defendant U.S. Department of Education. THIS MOTION IS BEING TREATED AS A MOTION TO DISMISS THE UNITED STATES DEPARTMENT OF EDUCATION AS A DEFENDANT. THE MOTION IS GRANTED. (cl) (Entered: 05/08/2019) |
| 05/10/2019 | | 11 | BNC Certificate of Mailing − PDF Document. (Re: 10 Order on Generic Motion) Notice Date 05/10/2019. (Admin.) (Entered: 05/11/2019) |
| 06/05/2019 | | 12 | |

| | | | |
|---|---|---|---|
| | | | Motion filed by Plaintiff Tamara Sara Parvizi to Take Further Action with certificate of service. (cl) (Entered: 06/05/2019) |
| 06/07/2019 | | 13 | Letter filed by Defendant Great Lakes Borrower Services Re: 1 Complaint. (cl) (Entered: 06/07/2019) |
| 06/11/2019 | | 14 | Hearing Scheduled for 7/25/2019 at 10:00 AM at Springfield Courtroom − Berkshire Re: 12 Motion of Plaintiff Tamara Sara Parvizi to take further action (spr) (Entered: 06/11/2019) |
| 06/13/2019 | | 15 | BNC Certificate of Mailing − Hearing. (Re: 14 Hearing Scheduled) Notice Date 06/13/2019. (Admin.) (Entered: 06/14/2019) |
| 07/03/2019 | | 16 | Motion filed by Plaintiff Tamara Sara Parvizi to Continue Hearing Re: 12 Motion filed by Plaintiff Tamara Sara Parvizi to Take Further Action. (cl) (Entered: 07/03/2019) |
| 07/05/2019 | | 17 | Endorsed Order dated 7/5/2019 Re: 16 Motion filed by Plaintiff Tamara Sara Parvizi to Continue Hearing Re: 12 Motion filed by Plaintiff Tamara Sara Parvizi to Take Further Action. GRANTED INASMUCH AS THE HEARING OF 07/25/19 IS CONTINUED TO 08/29/19 AT 10:00AM IN SPRINGFIELD. (cl) (Entered: 07/05/2019) |
| 07/05/2019 | | 18 | Court Certificate of Mailing Re: 17 Order on Motion to Continue Hearing. (cl) (Entered: 07/05/2019) |
| 07/10/2019 | | 19 | Motion filed by Plaintiff Tamara Sara Parvizi to Reinstate Original Hearing Date Re: 12 Motion filed by Plaintiff Tamara Sara Parvizi to Take Further Action. (cl) (Entered: 07/10/2019) |
| 07/10/2019 | | 20 | Endorsed Order dated 7/10/2019 Re: 19 Motion filed by Plaintiff Tamara Sara Parvizi to Reinstate Original Hearing Date Re: 12 Motion filed by Plaintiff Tamara Sara Parvizi to Take Further Action. GRANTED; THE HEARING OF 08/29/19 IS RESCHEDULED TO 07/25/19 AT 10:00AM IN SPRINGFIELD. (cl) (Entered: 07/10/2019) |
| 07/10/2019 | | 21 | Court Certificate of Mailing Re: 20 Order on Motion to Continue Hearing. (cl) (Entered: 07/10/2019) |
| 07/15/2019 | | 22 | Returned Mail re: 20 Order on Motion to Continue/Cancel Hearing returned to the Court by USPS as undeliverable. Invalid address for U.S. Department of Education (Great Lakes Borrowers) 33 Arch St #300, Boston, MA 02110. Pursuant to MLBR 2002−4, it is the responsibility of the debtor and/or debtors counsel to maintain the accuracy of the master mailing matrix and any amendments to it. The debtors attorney, or the debtor if pro se, must attempt to correct any incorrect addresses, resend the returned notices and notify the Court as to the address corrections. (ag) (Entered: 07/15/2019) |
| 07/18/2019 | | 23 | Returned Mail re: 20 Order on Motion to Continue/Cancel Hearing returned to the Court by USPS as undeliverable. Invalid address for U.S. Department of Education (Great Lakes Borrowers) 33 Arch St #300, Boston, MA 02110. Pursuant to MLBR 2002−4, it is the responsibility of the debtor and/or debtors counsel to maintain the accuracy of the master mailing matrix and any amendments to it. The debtors attorney, or the debtor if pro se, must attempt to correct any incorrect addresses, resend the returned notices and notify the Court as to the address corrections. (ag) (Entered: 07/18/2019) |

| 07/25/2019 | | 24 | Notice of Change of Address filed by Plaintiff Tamara Sara Parvizi (cl) (Entered: 07/25/2019) |
| 07/25/2019 | | 25 | Notice to Correct Address for Defendant filed by Plaintiff Tamara Sara Parvizi. (cl) (Entered: 07/25/2019) |
| 07/25/2019 | | | Hearing Held Re: 12 Motion filed by Plaintiff Tamara Sara Parvizi to Take Further Action. (cl) (Entered: 07/25/2019) |
| 07/25/2019 | | 26 | Order dated 7/25/2019 Re: 12 Motion filed by Plaintiff Tamara Sara Parvizi to Take Further Action. See Order for Full Text. (cl) (Entered: 07/25/2019) |
| 07/25/2019 | | 27 | Court Certificate of Mailing Re: 26 Order on Generic Motion (cl) (Entered: 07/25/2019) |
| 07/25/2019 | | 28 | Alias Summons Issued on Defendants Great Lakes Borrower Services and Department of Ed c/o General Counsel to Secretary of Education Date Issued 7/25/2019, Answer Due 8/26/2019. Summons must be served within seven (7) days of issuance Re: 1 Complaint filed by Plaintiff Tamara Sara Parvizi. (cl) (Entered: 07/25/2019) |
| 07/25/2019 | | 29 | Court Certificate of Mailing Re: 28 Alias Summons Issued. (cl) (Entered: 07/25/2019) |
| 08/05/2019 | | 30 | Certificate of Service Re: 28 Alias Summons Issued filed by Plaintiff Tamara Sara Parvizi. (cl) (Entered: 08/05/2019) |
| 08/26/2019 | | 31 | Answer to Complaint with certificate of service filed by U.S. Department of Education. (Brizius, Erin) (Entered: 08/26/2019) |
| 08/27/2019 | | 32 | Scheduling and Pre−Trial Order dated 8/27/2019 Re: 1 Complaint filed by Plaintiff Tamara Sara Parvizi. Pre−Trial Conference set for 10/23/2019 at 02:00 PM at Springfield Courtroom − Berkshire. IMPORTANT DEADLINES DO NOT IGNORE. (cl) (Entered: 08/27/2019) |
| 08/27/2019 | | 33 | Court Certificate of Mailing Re: 32 Pre−Trial Order. (cl) (Entered: 08/27/2019) |
| 09/10/2019 | | 34 | Joint Pre−Trial Statement with certificate of service filed by Defendant U.S. Department of Education (Brizius, Erin) (Entered: 09/10/2019) |
| 10/23/2019 | | | Hearing Held and Continued to 1/23/2020 at 10:00 AM at Springfield Courtroom − Berkshire Re: 1 Complaint filed by Plaintiff Tamara Sara Parvizi. (cl) (Entered: 10/24/2019) |
| 10/23/2019 | | 36 | Motion filed by Plaintiff Tamara Sara Parvizi to Continue Hearing Re: 1 Complaint. (cl) (Entered: 10/24/2019) |
| 10/24/2019 | | 35 | Order dated 10/24/2019 Re: 1 Complaint filed by Plaintiff Tamara Sara Parvizi. THIS PRE−TRIAL HEARING IS CONTINUED TO JANUARY 23, 2020 AT 10:00AM IN SPRINGFIELD. ANY DISPOSITIVE MOTIONS MUST BE FILED ON OR BEFORE 12/26/19; ANY RESPONSES TO DISPOSITIVE MOTIONS MUST BE FILED ON OR BEFORE 01/16/20. ANY TIMELY FILED DISPOSITIVE MOTIONS WILL BE HEARD ON JANUARY 23, 2020 AT 10:00AM IN SPRINGFIELD. (cl) (Entered: 10/24/2019) |

| | | | |
|---|---|---|---|
| 10/24/2019 | | <u>37</u> | Endorsed Order dated 10/24/2019 Re: <u>36</u> Motion filed by Plaintiff Tamara Sara Parvizi to Continue Hearing Re: <u>1</u> Complaint. GRANTED; THE HEARING OF 01/23/20 IS CONTINUED TO FRIDAY, JANUARY 31, 2020 AT 10:00AM IN COURTROOM 4 OF THE US BANKRUPTCY COURT, 595 MAIN STREET, WORCESTER. PARTIES SHOULD TAKE NOTE OF THE LOCATION CHANGE FOR THE RESCHEDULED HEARING. (cl) (Entered: 10/24/2019) |
| 10/26/2019 | | <u>38</u> | BNC Certificate of Mailing − PDF Document. (Re: <u>35</u> Order) Notice Date 10/26/2019. (Admin.) (Entered: 10/27/2019) |
| 10/26/2019 | | <u>39</u> | BNC Certificate of Mailing − PDF Document. (Re: <u>37</u> Order on Motion to Continue/Cancel Hearing) Notice Date 10/26/2019. (Admin.) (Entered: 10/27/2019) |
| 10/28/2019 | | <u>40</u> | Court Certificate of Mailing Re: <u>37</u> Order on Motion to Continue Hearing. (cl) (Entered: 10/28/2019) |
| 11/12/2019 | | <u>41</u> | Assented to Motion filed by Defendant U.S. Department of Education to Extend Time to Extend Pretrial Deadlines and to Reset Deadline for Filing Dispositive Motions Re: <u>32</u> Pre−Trial Order with certificate of service. (Brizius, Erin) (Entered: 11/12/2019) |
| 11/12/2019 | | <u>42</u> | Endorsed Order dated 11/12/2019 Re: <u>41</u> Assented to Motion filed by Defendant U.S. Department of Education to Extend Time to Extend Pretrial Deadlines and to Reset Deadline for Filing Dispositive Motions Re: <u>32</u> Pre−Trial Order. GRANTED. THE DEADLINES ARE EXTENDED AS REQUESTED. (cl) (Entered: 11/12/2019) |
| 11/26/2019 | | <u>43</u> | Notice of Deposition with certificate of service filed by Defendant U.S. Department of Education. (Brizius, Erin) (Entered: 11/26/2019) |
| 01/21/2020 | | <u>44</u> | Motion filed by Defendant U.S. Department of Education to Extend Time to File Documents [Re: <u>32</u> Pre−Trial Order] with certificate of service. (Brizius, Erin) (Entered: 01/21/2020) |
| 01/24/2020 | | <u>45</u> | Motion filed by Defendant U.S. Department of Education For Summary Judgment with certificate of service. (Brizius, Erin) (Entered: 01/24/2020) |
| 01/24/2020 | | <u>46</u> | Brief/Memorandum In Support of *Defendant's Motion for Summary Judgment* (Re: <u>45</u> Motion for Summary Judgment) filed by Defendant U.S. Department of Education (Attachments: # <u>1</u> Exhibit List in Accordance with MLBR Appendix 8, Rule 5(a)) (Brizius, Erin) (Entered: 01/24/2020) |
| 01/24/2020 | | <u>47</u> | Exhibit *A − L* (Re: <u>46</u> Brief/Memorandum) filed by Defendant U.S. Department of Education (Brizius, Erin) (Entered: 01/24/2020) |
| 01/24/2020 | | <u>48</u> | Endorsed Order dated 1/24/2020 Re: <u>44</u> Motion filed by Defendant U.S. Department of Education to Extend Time to File Documents Re: <u>32</u> Pre−Trial Order. MOOT. THE MOVANT TIMELY FILED A MOTION FOR SUMMARY JUDGMENT. (cl) (Entered: 01/24/2020) |
| 01/27/2020 | | <u>49</u> | Order dated 1/27/2020 Re: <u>1</u> Complaint filed by Plaintiff Tamara Sara Parvizi. IN LIGHT OF THE DEFENDANT FILING A MOTION FOR SUMMARY JUDGMENT, THE PRE−TRIAL HEARING SET FOR 01/31/20 HAS BEEN RESCHEDULED. THE PRE−TRIAL HEARING WILL NOW BE HELD ON THURSDAY, MARCH 12, 2020 AT |

| | | | |
|---|---|---|---|
| | | | 10:00AM IN SPRINGFIELD. (cl) (Entered: 01/27/2020) |
| 01/27/2020 | | 50 | Court Certificate of Mailing Re: 49 Order (cl) (Entered: 01/27/2020) |
| 01/27/2020 | | 51 | Hearing Scheduled for 3/12/2020 at 10:00 AM at Springfield Courtroom − Berkshire Re: 45 Motion of Defendant for Summary Judgment. Objection deadline is set for 03/20/20 at 4:00PM. (spr) (Entered: 01/27/2020) |
| 01/27/2020 | | 52 | Certificate of Service of Notice of Hearing (Re: 45 Motion for Summary Judgment) filed by Defendant U.S. Department of Education (Brizius, Erin) (Entered: 01/27/2020) |
| 01/29/2020 | | 53 | BNC Certificate of Mailing − Hearing. (Re: 51 Hearing Scheduled) Notice Date 01/29/2020. (Admin.) (Entered: 01/30/2020) |
| 03/12/2020 | | | Hearing Held Re: 45 Motion filed by Defendant U.S. Department of Education For Summary Judgment. (cl) (Entered: 03/12/2020) |
| 03/12/2020 | | 54 | Order dated 3/12/2020 Re: 45 Motion filed by Defendant U.S. Department of Education For Summary Judgment. DENIED. (cl) (Entered: 03/12/2020) |
| 03/12/2020 | | 55 | Final Pre Trial Order dated 3/12/2020 Re: 1 Complaint filed by Plaintiff Tamara Sara Parvizi. Trial Scheduled for 6/15/2020 at 10:00 AM at Worcester Courtroom 4 − EDK. See Order for Full Text. IMPORTANT DEADLINES. DO NOT IGNORE. (cl) (Entered: 03/12/2020) |
| 03/12/2020 | | 56 | Court Certificate of Mailing Re: 54 Order on Motion For Summary Judgment and 55 Final Pre Trial Order dated 3/12/2020 Re: 1 Complaint filed by Plaintiff Tamara Sara Parvizi. (cl) (Entered: 03/12/2020) |
| 05/15/2020 | | 57 | Motion filed by Defendant U.S. Department of Education to Continue Hearing [Re: 1 Complaint] with certificate of service. (Kaye, Raquelle) (Entered: 05/15/2020) |
| 05/19/2020 | | 58 | Order dated 5/19/2020 Re: 57 Motion filed by Defendant U.S. Department of Education to Continue Hearing Re: 1 Complaint. NO OPPOSITION HAVING BEEN FILED, THIS MOTION IS GRANTED. THE TRIAL SET FOR JUNE 15, 2020 HAS BEEN CONTINUED TO TUESDAY, SEPTEMBER 29, 2020 AT 10:00AM IN COURTROOM 4 OF THE HAROLD DONOHUE FEDERAL BUILDING AND COURTHOUSE, 595 MAIN STREET, WORCESTER, MA. THE DEADLINE FOR THE SUBMISSION OF A JOINT PRE−TRIAL MEMORANDUM IS EXTENDED TO 12:00PM ON SEPTEMBER 22, 2020. (cl) (Entered: 05/19/2020) |
| 05/21/2020 | | 59 | BNC Certificate of Mailing − PDF Document. (Re: 58 Order on Motion to Continue/Cancel Hearing) Notice Date 05/21/2020. (Admin.) (Entered: 05/22/2020) |
| 05/22/2020 | | 60 | Certificate of Service *of Notice of Continued Trial Date* filed by Defendant U.S. Department of Education (Kaye, Raquelle) (Entered: 05/22/2020) |
| 05/29/2020 | | 61 | Motion filed by Plaintiff Tamara Sara Parvizi for Telephonic Hearing Re: 1 Complaint. (cl) (Entered: 05/29/2020) |

| | | | |
|---|---|---|---|
| 06/03/2020 | | 62 | Order dated 6/3/2020Set Re: 61 Motion to Continue Hearing Re: 1 Complaint filed by Plaintiff Tamara Sara Parvizi. A TELEPHONIC STATUS CONFERENCE IN THIS ADVERSARY PROCEEDING IS SET FOR SEPTEMBER 2, 2020 AT 10:00 A.M. IN ORDER TO DISCUSS THE PROCEDURES TO BE USED FOR CONDUCTING THE TRIAL SCHEDULED FOR SEPTEMBER 29, 2020. PARTIES MAY PARTICIPATE IN THE STATUS CONFERENCE BY DIALING 888−363−4734, AND ENTERING ACCESS CODE 496 4809 WHEN PROMPTED. (cl) (Entered: 06/03/2020) |
| 06/03/2020 | | 63 | Court Certificate of Mailing Re: 62 Order To Set Hearing (cl) (Entered: 06/03/2020) |
| 08/31/2020 | | 64 | Notice of Temporary Additional Address filed by Plaintiff Tamara Sara Parvizi. (cl) (Entered: 08/31/2020) |
| 09/02/2020 | | | Hearing Held Re: 61 Motion filed by Plaintiff Tamara Sara Parvizi for Telephonic Hearing Re: 1 Complaint. (cl) (Entered: 09/02/2020) |
| 09/02/2020 | | 65 | Proceeding Memorandum and Order dated 9/2/2020 Re: 61 Motion filed by Plaintiff Tamara Sara Parvizi for Telephonic Hearing Re: 1 Complaint. IN PREPARATION OF THE TRIAL SCHEDULED FOR SEPTEMBER 29, THERE WILL BE A MANDATORY ZOOM PRACTICE SESSION HELD ON SEPTEMBER 22, 2020 AT 11:00AM, TO BE HOSTED BY THE COURTROOM DEPUTY. PARTIES ARE DIRECTED TO SEND AN EMAIL THE COURTROOM DEPUTY IN WHICH THEY PROVIDE HIM WITH THEIR EMAIL CONTACT INFORMATION SO THAT HE MAY SEND INVITATIONS TO THE PRACTICE SESSION. THE COURT WILL ISSUE A SUPPLEMENTAL ORDER REGARDING TRIAL BY VIDEO THAT WILL CONTAIN IMPORTANT INFORMATION AND DEADLINES FOR THE PARTIES TO ADHERE TO. (cl) (Entered: 09/02/2020) |
| 09/04/2020 | | 66 | Supplemental Order Regarding Trial by Video Re: 1 Complaint filed by Plaintiff Tamara Sara Parvizi. Notice of Participation due by 9/11/2020. Witness Information due by 9/11/2020. Exhibit Delivery to Participants/Court due by 9/18/2020. Exhibit Delivery to Witnesses due by 9/18/2020. See Order for Full Text. (cl) (Entered: 09/04/2020) |
| 09/04/2020 | | 67 | Court Certificate of Mailing (Re: 65 Order on Motion to Continue/Cancel Hearing, 66 Supplemental Order Re: Trial/Evid Hearing by Video). (ag) (Entered: 09/04/2020) |
| 09/04/2020 | | 68 | BNC Certificate of Mailing − PDF Document. (Re: 65 Order on Motion to Continue/Cancel Hearing) Notice Date 09/04/2020. (Admin.) (Entered: 09/05/2020) |
| 09/06/2020 | | 69 | BNC Certificate of Mailing − PDF Document. (Re: 66 Supplemental Order Re: Trial/Evid Hearing by Video) Notice Date 09/06/2020. (Admin.) (Entered: 09/07/2020) |
| 09/22/2020 | | 70 | Joint Pre−Trial Statement with certificate of service filed by Defendant U.S. Department of Education (Attachments: # 1 Exhibit) (Kaye, Raquelle) (Entered: 09/22/2020) |
| 09/29/2020 | | | Hearing Held Re: 1 Complaint filed by Plaintiff Tamara Sara Parvizi. (cl) (Entered: 09/29/2020) |

| | | | |
|---|---|---|---|
| 09/29/2020 | | <u>71</u> | Proceeding Memorandum and Order dated 9/29/2020 Re: <u>1</u> Complaint filed by Plaintiff Tamara Sara Parvizi. THIS MATTER IS TAKEN UNDER ADVISEMENT. (cl) (Entered: 09/29/2020) |
| 09/30/2020 | | <u>72</u> | Court Certificate of Mailing Re: <u>71</u> Proceeding Memorandum and Order. (cl) (Entered: 09/30/2020) |
| 10/01/2020 | | <u>73</u> | BNC Certificate of Mailing − PDF Document. (Re: <u>71</u> Order) Notice Date 10/01/2020. (Admin.) (Entered: 10/02/2020) |
| 10/06/2020 | | <u>74</u> | An official transcript of Zoom trial (RE: complaint to determine the dischargeability of debt) heard on 09/29/2020 has been filed. Pursuant to Judicial Conference Policy, electronic access to transcripts is restricted for 90 days from the date of filing. The transcript is available for inspection at the Clerk's Office or a copy may be purchased from the transcriber. Contact the ECR Operator for transcriber information. Parties have until 10/27/2020 to file a Request for Redaction with the Court. If no request is filed, the transcript may be made available electronically on 01/5/2021. (Cascade Hills Transcription, Inc.) (Entered: 10/06/2020) |
| 10/07/2020 | | <u>75</u> | Notice of Filing of Official Transcript. Notice is hereby given that an official transcript has been filed. Pursuant to the Judicial Conference policy governing public access to transcripts of federal court proceedings, transcripts are not electronically available(online) until 90 days after filing but may be inspected by clerk's office or purchased from the court transcriber during the 90−day period. (ADI) (Entered: 10/07/2020) |
| 10/09/2020 | | <u>76</u> | BNC Certificate of Mailing. (Re: <u>75</u> Notice of Filing of Official Transcript) Notice Date 10/09/2020. (Admin.) (Entered: 10/10/2020) |
| 10/23/2020 | | <u>77</u> | Response Re: <u>75</u> Notice of Filing of Official Transcript filed by Plaintiff Tamara Sara Parvizi. (cl) (Entered: 10/23/2020) |
| 05/12/2021 | | <u>78</u> | Order dated 5/12/2021 Re: <u>1</u> Adversary case 19−03003. Complaint by Tamara Sara Parvizi against U.S. Department of Education. THE PLAINTIFF, TAMARA SARA PARVIZI (THE "DEBTOR"), IS ORDERED TO SHOW CAUSE IN WRITING, BY JUNE 14, 2021, AS TO WHY THE COMPLAINT SHOULD NOT BE DISMISSED AS TO GREAT LAKES BORROWER SERVICES ("GREAT LAKES"), AS GREAT LAKES DOES NOT APPEAR TO BE A PROPER PARTY TO THIS ADVERSARY PROCEEDING AND THE DEBTOR HAS STIPULATED THAT ALTHOUGH GREAT LAKES DISBURSED FUNDS TO THE DEBTOR PURSUANT TO CERTAIN STUDENT LOAN PROMISSORY NOTES, THOSE LOANS WERE LATER SOLD TO THE UNITED STATES DEPARTMENT OF EDUCATION, IF THE DEBTOR FAILS OR DECLINES TO FILE A RESPONSE TO THIS ORDER, THE COURT WILL DISMISS THE COMPLAINT AS TO GREAT LAKES WITHOUT FURTHER NOTICE OR HEARING. (cl) (Entered: 05/12/2021) |
| 05/12/2021 | | <u>79</u> | Court Certificate of Mailing Re: <u>78</u> Order to Show Cause, <u>80</u> Opinion Issued and <u>81</u> Judgment. (cl) (Entered: 05/12/2021) |
| 05/12/2021 | | <u>80</u> | Memorandum of Decision dated 5/12/2021 Re: <u>1</u> Complaint filed by Plaintiff Tamara Sara Parvizi. A SEPARATE JUDGMENT IN CONFORMITY WITH THIS MEMORANDUM WILL ISSUE FORTHWITH. (cl) (Entered: 05/12/2021) |
| 05/12/2021 | | <u>81</u> | |

| | | | |
|---|---|---|---|
| | | | Judgment dated 5/12/2021 Re: 1 Complaint filed by Plaintiff Tamara Sara Parvizi. See Order for Full Text. (cl) (Entered: 05/12/2021) |
| 05/13/2021 | | 82 | Amended Memorandum of Decision dated 5/13/2021 Re: 1 Complaint filed by Plaintiff Tamara Sara Parvizi. SEPARATE JUDGMENT IN CONFORMITY WITH THIS MEMORANDUM WILL ISSUE FORTHWITH. (cl) (Entered: 05/13/2021) |
| 05/13/2021 | | 83 | Amended Judgment dated 5/13/2021 Re: 1 Complaint filed by Plaintiff Tamara Sara Parvizi. See Order for Full Text. (cl) (Entered: 05/13/2021) |
| 05/13/2021 | | 84 | Court Certificate of Mailing Re: 82 Amended Memorandum and Decision and 83 Amended Judgment. (cl) (Entered: 05/13/2021) |
| 05/14/2021 | | 85 | BNC Certificate of Mailing − PDF Document. (Re: 78 Order to Show Cause) Notice Date 05/14/2021. (Admin.) (Entered: 05/15/2021) |
| 05/14/2021 | | 86 | BNC Certificate of Mailing − PDF Document. (Re: 81 Order) Notice Date 05/14/2021. (Admin.) (Entered: 05/15/2021) |
| 05/14/2021 | | 87 | BNC Certificate of Mailing. (Re: 80 Opinion Issued) Notice Date 05/14/2021. (Admin.) (Entered: 05/15/2021) |
| 05/15/2021 | | 88 | BNC Certificate of Mailing − PDF Document. (Re: 83 Order) Notice Date 05/15/2021. (Admin.) (Entered: 05/16/2021) |
| 05/15/2021 | | 89 | BNC Certificate of Mailing. (Re: 82 Opinion Issued) Notice Date 05/15/2021. (Admin.) (Entered: 05/16/2021) |
| 05/27/2021 | | 90 | Motion filed by Defendant U.S. Department of Education to Amend [Re: 83 Order] with certificate of service. (Kaye, Raquelle) (Entered: 05/27/2021) |
| 05/28/2021 | | 91 | Endorsed Order dated 5/28/2021 Re: 90 Motion filed by Defendant U.S. Department of Education to Amend Re: 83 Order. THIS MOTION WILL BE HELD FOR RESPONSES UNTIL JUNE 28, 2021. (cl) (Entered: 05/28/2021) |
| 06/03/2021 | | 92 | Notice of Change of Address filed by Plaintiff Tamara Sara Parvizi (cl) (Entered: 06/03/2021) |
| 06/03/2021 | | 93 | Supplemental Certificate of Service (Re: 90 Motion to Amend) filed by Defendant U.S. Department of Education (Kaye, Raquelle) (Entered: 06/03/2021) |
| 06/08/2021 | | 94 | Notice of Appeal and Statement of Election to Bankruptcy Appellate Panel (RE: 80 Opinion Issued, 83 Order). Fee Amount $298 Filed by Plaintiff Tamara Sara Parvizi Appellant Designation due by 6/22/2021. Compiled Records Due by 7/6/2021. Transmission of Designation Due by 7/8/2021. (ag) (Entered: 06/08/2021) |
| 06/08/2021 | | 95 | Notice of Appeal to Bankruptcy Appellate Panel (Re: 94 Notice of Appeal and Statement of Election filed by Plaintiff Tamara Sara Parvizi). (ag) (Entered: 06/08/2021) |
| 06/08/2021 | | 96 | Court Certificate of Mailing (Re: 95 Notice of Appeal to BAP). (ag) (Entered: 06/08/2021) |

| | | | |
|---|---|---|---|
| 06/08/2021 | | 97 | Clerk's Notice of Fees Due (Re: 94 Notice of Appeal and Statement of Election filed by Plaintiff Tamara Sara Parvizi). Fee due by 6/22/2021. (ag) (Entered: 06/08/2021) |
| 06/08/2021 | | 98 | Court Certificate of Mailing. (Re: 97 Clerk's Notice of Fees Due) (ag) (Entered: 06/08/2021) |
| 06/08/2021 | | 99 | Initial Transmittal to BAP (Re: 94 Notice of Appeal and Statement of Election filed by Plaintiff Tamara Sara Parvizi) (ag) (Entered: 06/08/2021) |
| 06/09/2021 | | 100 | Order dated 6/9/21 Re: 95 Notice of Appeal to Bankruptcy Appellate Panel. IN LIGHT OF THE PENDING MOTION TO ALTER OR AMEND JUDGMENT FILED BY THE UNITED STATES DEPARTMENT OF EDUCATION [DOCKET #90], THE NOTICE OF APPEAL FILED BY THE PLAINTIFF, TAMARA S. PARVIZI, ON JUNE 8, 2021 WILL BECOME EFFECTIVE WHEN AN ORDER DISPOSING OF THE MOTION TO ALTER OR AMEND JUDGMENT IS ENTERED. SEE FED. R. BANKR. P. 8002(b)(2). (ag) (Entered: 06/09/2021) |
| 06/09/2021 | | 101 | Court Certificate of Mailing (Re: 100 Order). (ag) (Entered: 06/09/2021) |
| 06/09/2021 | | 102 | Endorsed Order dated 6/9/2021 Re: 90 Motion filed by Defendant U.S. Department of Education to Amend [Re: 83 Order].  IT APPEARING THAT THE COURT'S MAY 28, 2021 ORDER ON THIS MOTION WAS NOT SERVED UPON THE PLAINTIFF, TAMARA S. PARVIZI, THIS MOTION WILL NOW BE HELD FOR RESPONSES UNTIL JULY 6, 2021. THE CLERK'S OFFICE IS DIRECTED TO SERVE A COPY OF THIS ORDER ON THE PLAINTIFF FORTHWITH. (ag) (Entered: 06/09/2021) |
| 06/09/2021 | | 103 | Court Certificate of Mailing (Re: 102 Order on Motion to Amend). (ag) (Entered: 06/09/2021) |
| 06/21/2021 | | | Receipt of Appeal Adversary Filing Fee − $298.00 by CL. Receipt Number 205539. (adi) (Entered: 06/21/2021) |
| 07/06/2021 | | | Notice of Docketing Record on Appeal to BAP. Case Number: 21−021 Re: 94 Notice of Appeal and Statement of Election filed by Plaintiff Tamara Sara Parvizi. (sas) (Entered: 07/06/2021) |
| 07/06/2021 | | 104 | Court Certificate of Mailing (Second time mailed to Debtor) (Re: 83 Amended Memorandum of Decision). (pf) (Entered: 07/06/2021) |
| 07/19/2021 | | 105 | Returned Mail re: 83 Order returned to the Court by USPS as undeliverable. Invalid address for Tamara Sara Parvizi 416 William Canning Blvd #1007 Fall River, MA 01721. Pursuant to MLBR 2002−4, it is the responsibility of the debtor and/or debtors counsel to maintain the accuracy of the master mailing matrix and any amendments to it. The debtors attorney, or the debtor if pro se, must attempt to correct any incorrect addresses, resend the returned notices and notify the Court as to the address corrections. (ag) (Entered: 07/19/2021) |
| 07/26/2021 | | 106 | Notice of Change of Address filed by Plaintiff Tamara Sara Parvizi. (cl) (Entered: 07/26/2021) |
| 07/28/2021 | | 107 | |

| | | | |
|---|---|---|---|
| | | | Order dated 7/28/2021 Re: 90 Motion filed by Defendant U.S. Department of Education to Amend 83 Order. GRANTED. A SEPARATE FORM OF JUDGMENT WILL ENTER FORTHWITH. See Order for Full Text. (cl) (Entered: 07/28/2021) |
| 07/28/2021 | | 108 | Court Certificate of Mailing Re: 107 Order on Motion to Amend. (cl) (Entered: 07/28/2021) |
| 07/28/2021 | | 109 | Second Amended Judgment dated 7/28/2021 Re: 1 Complaint filed by Plaintiff Tamara Sara Parvizi. See Order for Full Text. (cl) (Entered: 07/28/2021) |
| 07/28/2021 | | 110 | Court Certificate of Mailing Re: 109 Second Amended Judgment (cl) (Entered: 07/28/2021) |
| 07/28/2021 | | 111 | Order dated 7/28/2021 Re: 78 Order dated 5/12/2021 Re: 1 Adversary case 19−03003. Complaint by Tamara Sara Parvizi against U.S. Department of Education. NO RESPONSE HAVING BEEN FILED TO THE COURT'S MAY 12, 2021 ORDER TO SHOW CAUSE [DOCKET #78], GREAT LAKES BORROWER SERVICES IS HEREBY DISMISSED AS A DEFENDANT IN THIS ADVERSARY PROCEEDING. (cl) (Entered: 07/28/2021) |
| 07/28/2021 | | 112 | Court Certificate of Mailing Re: 111 Order dated 7/28/2021 Re: 78 Order dated 5/12/2021 Re: 1 Adversary case 19−03003. Complaint by Tamara Sara Parvizi against U.S. Department of Education. (cl) (Entered: 07/28/2021) |
| 08/12/2021 | | 113 | Certification of Default Re: 94 Notice of Appeal and Statement of Election filed by Plaintiff Tamara Sara Parvizi. (cl) (Entered: 08/12/2021) |
| 08/12/2021 | | 114 | Transmittal Re: 113 Certification of Default. (cl) (Entered: 08/12/2021) |
| 08/16/2021 | | 115 | Statement of Issues Filed by Plaintiff Tamara Sara Parvizi (RE: 94 Notice of Appeal and Statement of Election). (ag) (Entered: 08/16/2021) |
| 09/22/2021 | | 116 | Appellant Designation of Contents For Inclusion in Record On Appeal Filed by Plaintiff Tamara Sara Parvizi Re: 94 Notice of Appeal and Statement of Election. (cl) (Entered: 09/22/2021) |
| 09/24/2021 | | 117 | Transmittal of Record on Appeal to BAP Re: 94 Notice of Appeal and Statement of Election filed by Plaintiff Tamara Sara Parvizi. (cl) (Entered: 09/24/2021) |
| 10/05/2021 | | 118 | Appellee Designation of Contents for Inclusion in Record of Appeal Filed by Defendant U.S. Department of Education (RE: 94 Notice of Appeal and Statement of Election). (Kaye, Raquelle) (Entered: 10/05/2021) |

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

In re:

TAMARA SARA PARVIZI,

     Debtor.

Case No. 18-30578-EDK
Chapter 7

TAMARA SARA PARVIZI,

     Plaintiff,

     v.

U.S. DEPARTMENT OF EDUCATION,

     Defendant.

Adv. Proc. No. 19-03003-EDK

**ANSWER OF THE UNITED STATES OF AMERICA TO
COMPLAINT TO DETERMINE DISCHARGEABILITY OF
STUDENT LOANS PURSUANT TO 11 U.S.C. § 523(a)(8)**

The United States of America (the "United States" or the "Defendant"), on behalf of its

department, the Department of Education ("DOE"), hereby files this Answer to the Complaint to

discharge student loan obligations pursuant to 11 U.S.C. § 523(a)(8) filed by the debtor Tamara

Sara Parvizi (the "Plaintiff").

1.     With respect to Sentence 1, [1] DOE admits that Plaintiff is filing a complaint for a

discharge of student loan debt. DOE further admits that Plaintiff is indebted to DOE in the

amount of $621,990.06 as of April 30, 2019.

---

[1] Plaintiff does not number paragraphs in the Complaint. Accordingly, this Answer numbers the
corresponding response to each sentence in the Plaintiff's Complaint as a separate paragraph.

1

2.      With respect to Sentence 2, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

3.      With respect to Sentence 3, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

4.      With respect to Sentence 4, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

5.      With respect to Sentence 5, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

6.      With respect to Sentence 6, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

7.      With respect to Sentence 7, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

8.      With respect to Sentence 8, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

9.      With respect to Sentence 9, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

10.      With respect to Sentence 10, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

11.      With respect to Sentence 11, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

12.      With respect to Sentence 12, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

13.     With respect to Sentence 13, DOE admits that Plaintiff filed the underlying Chapter 7 bankruptcy case 18-30578 on July 17, 2018.

14.     With respect to Sentence 14, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

15.     With respect to Sentence 15, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

16.     With respect to Sentence 16, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

17.     With respect to Sentence 17, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

18.     With respect to Sentence 18, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

19.     With respect to Sentence 19, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

20.     With respect to Sentence 20, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

21.     With respect to Sentence 21, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

22.     With respect to Sentence 22, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

23.     With respect to Sentence 23, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

24. With respect to Sentence 24, DOE is without knowledge or information sufficient to form a belief as to the truth of the allegations.

25. The Defendant denies each and every allegation not previously admitted, denied, or unqualified.

WHEREFORE, the United States of America prays that the Court dismiss the Complaint or, in the alternative, that the Court deny the relief sought in the Complaint, and grant such further relief as the Court deems just and proper.

<div style="margin-left: 40%;">

Respectfully submitted,

UNITED STATES OF AMERICA
By its attorneys

ANDREW E. LELLING
United States Attorney

</div>

Date: August 26, 2019      By:    /s/ Erin E. Brizius
ERIN E. BRIZIUS (NY # 4821161)
Assistant United States Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210
Tel. No. (617) 748-3398
erin.e.brizius2@usdoj.gov

<div style="text-align: center;">4</div>

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

In re:

TAMARA SARA PARVIZI,

     Debtor.

_____

TAMARA SARA PARVIZI,

     Plaintiff,

     v.

U.S. DEPARTMENT OF EDUCATION,

     Defendant.

Case No. 18-30578-EDK
Chapter 7

Adv. Proc. No. 19-03003-EDK

## **CERTIFICATE OF SERVICE**

I, Erin E. Brizius, hereby certify that on August 26, 2019 I electronically filed the foregoing document with the U.S. Bankruptcy Court for the District of Massachusetts by using the CM/ECF system. The foregoing document will be electronically sent to the parties who are currently on the list to receive e-mail notices in this case.

I further certify that on August 26, 2019, I served a copy of the same by first-class U.S. mail, postage pre-paid, to the following:

Tamara Sara Parvizi
45 Schoolhouse Rd
Amherst, MA 01002

Date:  August 26, 2019          /s/ Erin E. Brizius_____
                                  ERIN E. BRIZIUS

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

In re:

TAMARA SARA PARVIZI,

     Debtor.

Case No. 18-30578-EDK
Chapter 7

Adv. Proc. No. 19-03003-EDK

TAMARA SARA PARVIZI,

     Plaintiff,

     v.

U.S. DEPARTMENT OF EDUCATION,

     Defendant.

## JOINT PRETRIAL MEMORANDUM

The plaintiff, Tamara Sara Parvizi ("Plaintiff") and the defendant, U.S. Department of Education ("Defendant" or "DOE"; and together with the Plaintiff, the "Parties") respectfully submit this Joint Pretrial Memorandum concerning the trial in this action pursuant to this Court's Final Pretrial Order [Docket No. 43] ("Final Pretrial Order").

### I.     STATEMENT OF STIPULATED FACTS

The Parties hereby submit the below facts to which the Parties have stipulated (the "Stipulated Facts"). The Parties respectfully request that these Stipulated Facts be admitted into evidence at trial and that no independent proof of such facts be required.

### A.   Bankruptcy Court's Jurisdiction and Venue

1.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 157(a) and 1334(a). This action is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.   Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409.

### B.   The Parties

3.   Plaintiff is a fifty-year-old woman currently residing at 150 Bridgham Street, Providence, RI 02909. Plaintiff has no dependents and has never had any dependents.

4.   The Defendant is the Department of Education (the "DOE"). The DOE holds Defendant's student loans (i) held by and funded through the federal government through the William D. Ford Federal Direct Loan Program (the "Direct Loans"), and (ii) the student loans funded by private lenders, guaranteed and held by the federal government through the Federal Family Educational Loan Program (the "FFELP Loans") and together with the Direct Loans, the "Student Loans").

### C.   The Bankruptcy Filing

5.   Plaintiff filed a petition seeking relief under Chapter 7 of the Bankruptcy Code on July 1, 2018 (the "Petition Date"). On January 28, 2019, the Court granted Plaintiff a discharge pursuant to 11 U.S.C. § 727.

6.   On January 31, 2019, Plaintiff filed the above-captioned adversary proceeding seeking to discharge her Student Loans.

### D.   Plaintiff's Student Loan Obligations

#### 1.   Plaintiff's Direct Loans

7.   On August 2, 1997, the Plaintiff executed a Federal Direct Stafford/Ford Loan Program Promissory Note. On September 26, 1997, DOE disbursed funds pursuant to the note in the amounts of $6,757.00 and $2,243.00. On September 22, 1997, the Plaintiff executed a second

2

Federal Direct Stafford/Ford Loan Program Promissory Note. On September 26, 1997, DOE disbursed $1,742.00, and on November 7, 1997, DOE disbursed $1,520.00. On November 3, 1997, the Plaintiff executed a third Federal Direct Stafford/Ford Loan Program Promissory Note. On November 7, 1997, DOE disbursed $1,749.00 pursuant to the note.

8. On April 8, 2000, the Plaintiff executed a Federal Direct Consolidation Loan and Promissory Note. Pursuant to that loan, DOE disbursed $45,455.41 and $19,180.92 on May 18, 2000.

9. The Plaintiff executed a Federal Direct Stafford/Ford Loan Program Master Promissory Note on November 10, 2010. On November 24, 2010, DOE disbursed $8,500.00 and $12,000.00. On April 2, 2011, DOE disbursed another $8,500.00 and $12,000.00. On January 13, 2012, DOE disbursed a third set of funds for $8,500.00 and $12,000.00.

10. On July 30, 2010, Plaintiff executed a Federal Direct PLUS Loan Application and Master Promissory Note. DOE disbursed $45,401.00 on August 10, 2010; $14,332.00 on April 2, 2011; $34,088.00 on August 26, 2011; $2,008.00 on September 27, 2011; and $13,781.00 on January 13, 2012.

## 2.      Plaintiff's FFLEP Loans

11. On July 8, 2009, Plaintiff executed a FFELP Federal Stafford Loan Master Promissory Note. Pursuant to the note, Great Lakes, through Citibank, disbursed $8,500.00 on July 16, 2009, and $12,000.00 on September 3, 2009. On December 23, 2009, Plaintiff executed a FFELP Federal PLUS Loan Application and Master Promissory Note. Pursuant to the note, Great Lakes, through

Wilmington Trust Co., disbursed $54,055.00 on December 30, 2009, and $1,642.00 on May 17, 2010. Both FFELP loans were later sold to DOE for enforcement and collection.

### 3.    Summary of Amount Due

12. As of September 10, 2020, the Plaintiff owed DOE $478,070.53 in unpaid principal, and $175,772.80 in interest, for a total indebtedness to DOE of $653,843.33 based on the Student Loans taken to fund her education from 1997 to 2012.

13. In total, Plaintiff has received credit for payments of $3,960.95 on the Student Loans. This figure is comprised of amounts that have been offset from her tax refunds through the Treasury Offset Program.

14. In 2007, Plaintiff received a $100,000 inheritance from her father. At that time her Student Loans to date were in default and she owed approximately $123,000. She offered DOE $45,000 to compromise the debt she owed at that time. DOE rejected the offer because based on a financial statement submitted by Plaintiff, DOE believed she had an ability to pay. When DOE rejected the offer, Plaintiff sent DOE a letter dated August 16, 2007 inquiring as to the reason for the rejection. In the letter she stated "… what it comes down to is this: whether I choose to live my life within or outside the United States." Plaintiff spent the $100,000 inheritance and did not make any payments towards her Student Loans.

15. Plaintiff was previously enrolled in an income-based repayment plan with a monthly payment of $0 effective September 21, 2014 for 12 months. Her enrollment ended after 12 months because she failed to return the form required each year recertifying her income. Although she remains eligible, Plaintiff is not currently enrolled in an income-based repayment plan and is unwilling to enroll in such a program.

4

### E.  Plaintiff's Repayment Options

16. Plaintiff is eligible for an approximately $80 per month repayment plan for 25 years through the Revised Pay As You Earn ("REPAYE") program based on an estimated Adjusted Gross Income of $28,668.

17. Recognizing that student borrowers may encounter financial difficulty, the DOE offers several repayment plans tied to a borrower's income level and number of dependents (known as income-driven repayment plans or IDRs). The most generous of those plans is REPAYE. Loans in the Direct Loan Program are eligible for participation in REPAYE, and Plaintiff's FFELP loans would also be eligible upon consolidation through a Direct Consolidation Loan. Under REPAYE, a borrower's aggregate monthly loan payment is limited to ten percent of the amount by which the borrower's adjusted gross income exceeds 150% of the federal poverty guideline applicable to the borrower's family size, divided by 12. DOE determines family size by identifying the borrower's spouse and dependents and uses the borrower's adjusted gross income reported to the Internal Revenue Service. The Department of Health and Human Services publishes the yearly poverty guideline applicable to DOE's calculation. If the borrower participates in REPAYE for 20 years for undergraduate Direct loans and 25 years for Direct graduate loans, the entire loan balance, including accrued interest, is forgiven and DOE cancels the debt.

18. If a borrower earns less than 150% of the poverty level for a borrower's family size, the payment will be $0 per month. Years during which a borrower's monthly payment is $0 per month count equally towards the 20 – 25 year repayment period. The required annual loan payment under REPAYE is capped at 10% of a borrower's earnings above 150% of the applicable poverty level. Because the monthly REPAYE payment is calculated as a percentage of a borrower's income, if a borrower's income drops, the monthly payment is reduced accordingly. For example,

5

if a borrower with no dependents earned $20,000 in annual income, the payment would be $7.17
per month. If the borrower's income increased to $40,000 the payment would increase to $173.83.
The following chart illustrates the range of monthly payments under the REPAYE program based
on adjusted gross income up to $50,000:

| AGI | REPAYE |
|---|---|
| $19,140 or below | $0 |
| $20,000 | $7.17 |
| $28,668 | $79.40 |
| $35,000 | $132.17 |
| $40,000 | $173.83 |
| $45,000 | $215.50 |
| $50,000 | $257.17 |

19. The REPAYE payment is recalculated annually based on a borrower's prior year's federal
tax return, or current income if the most recent tax information does not accurately reflect a
borrower's prior year's earnings. If a borrower elects REPAYE, then a borrower must sign a
consent form authorizing the disclosure of a borrower's tax information and a borrower must
recertify his family size on an annual basis.

### F.   Plaintiff's Medical and Disability History

20. Plaintiff does not currently have and has never had any physical or mental health issues
or disabilities that prevent her from working or otherwise limit her ability to work.

6

### G.    Plaintiff's Education and Work History

21. Plaintiff obtained her bachelor's degree from Clark University in 1990. From 1991 to 1995, Plaintiff attended medical school at University of Rochester School of Medicine. She left voluntarily without obtaining a degree. In 1997, Plaintiff attended University of Massachusetts, Amherst, to pursue a master's degree in public health. Plaintiff received her master's degree in 1999.

22. After receiving her master's degree, Plaintiff worked briefly in public health. In 1999, she was employed as an assistant program director in Worcester, Massachusetts, and earned between $30,000 and $40,000 per year. She left that job after six months to take a position as the director of a public health program affiliated with UMass Medical Center. She earned approximately $50,000 per year but left voluntarily after six months because she was not committed to the organization's mission.

23. For the next seven years, until attending medical school for the second time, Plaintiff assisted her father who had medical issues, did small odd jobs, taught, and pursued an artistic interest in painting.

24. Plaintiff applied for some jobs in public health, but she did not apply to any outside of the Boston/Worcester area because she became more interested in teaching. Plaintiff was not willing to compromise her interests to work as an administrator of a public health program.

25. In 2008, Plaintiff returned to medical school at St.George's University School of Medicine. She graduated as a doctor of medicine in 2012.

26. In June 2012, after graduating from medical school, Plaintiff began a four-year residency program in psychiatry at the University of Vermont, earning $50,000 per year. However, in January 2013, Plaintiff left the program after a conflict with the program director. Plaintiff's

supervisor placed her on leave. Plaintiff chose not to appeal the decision. Instead, she retained a lawyer and received a letter from the program stating that she had completed her rotations successfully and left voluntarily.

27. The residency program continued to pay Plaintiff her $50,000 per year salary until June 2013. She did not work from January to June 2013 while she studied for a licensing exam. Beginning in August or September 2013, she re-applied for residency programs. For the first two years, Plaintiff applied only to residency programs in psychiatry. From 2015 to 2017, she applied to programs in family medicine and pathology as well. She was not offered a position in a residency program and has not applied to any programs since 2017. She is not licensed to practice medicine. Apart from applying to residency programs, Plaintiff has not sought work in the medical field since 2014.

### H.   Plaintiff's Current Income and Expenses

28. Plaintiff has worked primarily as an adjunct professor, tutor, and substitute teacher. In 2019 she earned $28,668. In 2018, she earned $41,336. In 2017, her income was $20,876, and in 2016, her income was $21,588.

29. Plaintiff currently works as an adjunct professor at the Massachusetts College of Pharmacy and Health Science ("MCPHS"). She is employed for the fall semester, beginning September 2, 2020 and ending December 11, 2020. She has not yet lined up employment for the spring semester.

30. Prior to her current position, Plaintiff worked as a teacher for the North American Hockey Association ("NAHA") approximately 20 hours per week, earning approximately $30 per hour. Her employment at NAHA ended in March 2020. She was also a substitute teacher at schools in

Rhode Island one to five days a week, depending on her schedule, earning $100 to $120 per day. During that time period, Plaintiff estimated that she earned approximately $2,500 total per month.

31. Plaintiff collected $5,781 in unemployment for the period April 24, 2020 through August 31, 2020 due to her loss of income as a substitute teacher. She also taught a ten-week online biology class for MCPHS, earning $3,500. During this four month period Plaintiff earned approximately $1,900 per month.

32. Plaintiff estimates that she currently earns approximately $3,400 total per month.

33. Plaintiff's expenses total approximately $1,600 per month and include the following:

    a. $800 per month in rent;

    b. $85 per month on a storage unit;

    c. $108 per month on car insurance;

    d. $45 per month on renter's insurance;

    e. $60 for a cell phone;

    f. $300 per month on groceries; and

    g. $200 per month on discretionary expenses.

34. As Plaintiff's income has fluctuated her discretionary income has also fluctuated. Over the course of 2020 Plaintiff's discretionary income has ranged from $400 to $1,800 per month.

35. Plaintiff owns a BMW Mini Cooper, which she purchased in 2015 for approximately $20,000. This month, Plaintiff completed her $320 per month car payments on the car.

## I.    Stipulation Regarding Bank Records

36. The Parties agree that the following bank records, which were produced by Plaintiff to counsel to DOE on October 11, 2019 are a true and accurate reflection of Plaintiff's account transactions for each relevant period:

9

    a.  June 12, 2019 to July 12, 2019 Bank of America Statement

    b.  July 13, 2019 to August 13, 2019 Bank of America Statement

    c.  May 12, 2017 to June 13, 2017 Bank of America Statement

    d.  August 14, 2019 to September 11, 2019, Bank of America Statement

## II.   STATEMENT OF CONTESTED FACTS

Whether the Plaintiff's (1) past, present, and reasonably reliable future financial resources; (2) her reasonable necessary living expenses; and (3) any other relevant facts and circumstances unique to the case prevent the debtor from paying the Student Loans in question while still maintaining a minimal standard of living, even when aided by a discharge of other prepetition debts?

## III.   SUMMARY OF THE CASE

### A.   <u>Plaintiff's Summary</u>

Please see Letter to the Springfield Bankruptcy Court attached hereto as <u>Exhibit 1</u> for Plaintiff's Summary of the Case.

### B.   <u>Defendant's Summary</u>

Plaintiff wishes to discharge her student loans due to the size of the debt and what she considers to be disappointing job prospects unsuitable to someone of her level of education. Discharge of federal student loan debt in bankruptcy is an extraordinary step. Plaintiff owes the DOE $653,843.33 from loans used to fund her education. She has a bachelor's degree, a master's degree in public health, and is a doctor of medicine. She has no physical or mental health problems and no dependents. DOE asks only that Plaintiff enroll in an $80 per month repayment plan. This repayment amount accounts for her current financial circumstances, but allows Plaintiff to reduce the monthly payment amount should these circumstances change. The program also leaves open

<div align="center">10</div>

the possibility that she may contribute more to her taxpayer-funded debt if her circumstances change for the better. At the end of the program, her debt will be discharged, regardless of any outstanding balance due. Plaintiff, however, refuses to enroll in an income-driven repayment plan. Instead, she has made zero voluntary payments towards her Student Loans and asks this Court to discharge her more than $650,000 federal debt in bankruptcy.

37. Plaintiff cannot establish the undue hardship required by 11 U.S.C. § 523(a)(8) to discharge her federal debt. To the contrary, the evidence is clear that Plaintiff has maintained more than a minimal standard of living while her federal debt has been outstanding. Two years after withdrawing from her medical residency program, Plaintiff purchased a BMW Mini Cooper, committing to monthly payments of $320. Moreover, the evidence reflects that Plaintiff has a history of substantial discretionary purchases. And in 2007, Plaintiff received a $100,000 inheritance, but paid none of it towards her student loans. Indeed, Plaintiff has paid only $3,960.95 on her substantial student loan debt solely through involuntary payments pursuant to the Treasury Offset Program. The evidence is also clear that during periods where Plaintiff's financial circumstances have improved, she has not made a good faith effort to maximize her income in order to repay her loans.

Plaintiff has more than sufficient discretionary income to make the monthly payments required under the REPAYE program. This month, Plaintiff completed her $320 per month car payments on her car. Over the course of 2020, Plaintiff's discretionary income has ranged from $400 to $1,800 per month. Plaintiff cannot show that her participation in an income-driven repayment program would pose an undue hardship in light of her current circumstances.

## IV.   ISSUES OF LAW

The Parties agree that the totality of the circumstances test applies in this District. The only issue to be determined is whether Plaintiff is entitled to a discharge of her Student Loans when applying the facts to the law.

## V.   WITNESSES

Plaintiff will testify live during the trial, subject to cross-examination by the Defendant. The Parities do not plan to present any testimony by means of a deposition.

## VI.   EXHIBITS

### A.   Plaintiff's Exhibits

1.  Ex. A – Resume of Tamara Parvizi, MD, MPH

2.  Ex. B - Langrock Sperry & Wool, LLP Press Release dated June 15, 2011

3.  Ex. C – Academic Remediation Plan Rebuttal

4.  Ex. D – Emails from Plaintiff to attorney Hobart F. Popick dated March 18, 2013 and July 2, 2013.

5.  Ex. E(a) – Fletcher Allen Healthcare Letter dated April 22, 2013

6.  Ex. E(b) – Fletcher Allen Healthcare Letter dated April 24, 2013

7.  Ex. E(c) – Langrock Sperry & Wool, LLP Letter dated April 26, 2013

8.  Ex. F – Email from The Match National Residency Program to Plaintiff dated October 10, 2019

9.  Ex. G – Various Job Application Submission Confirmations from August 2019

10. Ex. H(a) – Email dated February 22, 2020 from Roger Denome, Associate Dean MCPHS to Plaintiff

11. Ex. H(b) – Email dated August 12, 2020 from Roger Denome, Associate Dean MCPHS to Plaintiff.

12. Ex. H(c) – Email dated August 3, 2020 from Roger Denome, Associate Dean MCPHS to Plaintiff

13. Ex. H(d) – Offer of Employment Letter dated August 21, 2020 from Roger Denome, Associate Dean MCPHS to Plaintiff

14. Ex. I – List of Plaintiff's addresses since 2013

15. Ex. J - Severance Agreement with UVM Health Center

**B.    Defendant's Exhibits**

1.  Ex. A - August 16, 2007 Letter from Plaintiff to DOE

2.  Ex. B - Resume of Tamara Parvizi, MD, MPH

3.  Ex. C - June 12, 2019 to July 12, 2019 Bank of America Statement

4.  Ex. D July 13, 2019 to August 13, 2019 Bank of America Statement

5.  Ex. E May 12, 2017 to June 13, 2017 Bank of America Statement

6.  Ex. F August 14, 2019 to September 11, 2019, Bank of America Statement

7.  Ex. G Mini Cooper Vehicle Purchase Contract dated July 31, 2015

8.  Ex. H Plaintiff's Response to Interrogatories

9.  Ex. I Fletcher Allen Healthcare Letter dated April 22, 2013

10. Ex. J Financial Statement of Debtor dated October 15, 2019

11. Ex. K Transcript of the deposition of the Plaintiff held on December 19, 2019

## VII.    LENGTH OF TRIAL

The Parties estimate that the trial will take one day.

## VIII.  MEDIATION

Plaintiff is only interested in a complete discharge of her Student Loans, accordingly the

Parties agree that mediation is not an appropriate means of resolving this dispute.


Respectfully submitted,

UNITED STATES OF AMERICA                    TAMARA SARA PARVIZI
By its attorneys                            *Pro Se*

ANDREW E. LELLING
United States Attorney

By:    /s/ *Raquelle L. Kaye*                By:    /s/ *Tamara S. Parvizi*

      RAQUELLE L. KAYE                          TAMARA S. PARVIZI
      Assistant United States Attorney           45 Schoolhouse Road
      1 Courthouse Way, Suite 9200               Amherst, MA 01002
      Boston, MA 02210
      Tel. No. (617) 748-3403
      raquelle.kaye@usdoj.gov


Date: September 22, 2020                     Date: September 22, 2020

## CERTIFICATE OF SERVICE

I, Raquelle L. Kaye, hereby certify that on <u>September 22, 2020</u> I electronically filed the foregoing document with the U.S. Bankruptcy Court for the District of Massachusetts by using the CM/ECF system. The foregoing document will be electronically sent to the parties who are currently on the list to receive e-mail notices in this case.

I further certify that on <u>September 22, 2020</u>, I served a copy of the same by electronic mail and first-class U.S. mail, postage pre-paid, to the following:

Tamara Sara Parvizi
45 Schoolhouse Road
Amherst, MA 01002

Tamara Sara Parvizi
150 Bridgham Street
Providence, RI 02909

Date:  September 22, 2020                                /s/ Raquelle L. Kaye
                                                        RAQUELLE L. KAYE

**Exhibit 1**

**Adversary Case No. 19-03003**
Tamara Parvizi
Summary Statement
September 2020

To the Springfield Bankruptcy Court:

My name is Tamara Parvizi **(see exhibit A)** and I have filed this claim to seek relief from student loans worth over $600,000 — after <u>years</u> of unsuccessfully seeking to complete my medical residency that would allow me to practice medicine and repay these loans. I am providing documents to support my claim that I was forced out of my residency program under highly questionable circumstances — thereby not only cutting short my medical career, but also placing me in a position of being both under and over qualified to do very little else, except to teach at a level of subsistence.

1. In June 2012, after graduating from St. George's University School of Medicine, I began my residency training in psychiatry at the University of Vermont Medical Center (then known as Fletcher Allen Health Care) — after having been very enthusiastically recruited there by the Residency Program Director, Dr. Judith Lewis (based on my previous research with world-renowned behavioral health researcher at the University of Massachusetts Medical Center, Dr. Jon Kabat-Zinn.)

>    **NOTE**: unbeknownst to me at the time — in 2011, a psychiatry resident, Dr. Shari Young, had successfully sued the program for breach of contract, and after a jury trial — she won one of the largest civil law suits in the history of Vermont. **(see exhibit B)**

2. Within approximately 4 months of my residency, around October 2012 — I was suddenly notified that I was being placed on a remediation plan, with no prior notice or suspicion that anything was wrong . **(See Exhibit C)** The complaints listed were, uncharacteristically, based on: a) issues that were common to all residents; b) complaints from a medical student; c) complaints from a nurse who was never even involved in a particular situation with a brand new nurse; d) a case involving a malingering patient in the ER where there was no compromise of patient care whatsoever.

3. **Exhibit D** — The hospital failed to give me a hearing "<u>within four weeks</u>" of my appeal (as they were supposed to according to their own by-laws) — thereby jeopardizing my chances of seeking re-entry into a different residency program (due to the timing of the residency match and the uncertainty of my fate at Fletcher Allen). This was a clear cut case of breach of contract, if nothing else.

Also, immediately following my departure from the program, I found out that Dr. Lewis had replaced me with a former student of hers — who had been fired from the Tufts psychiatry residency program and placed on the Massachusetts Medical Disciplinary Board for self-prescribing controlled substances during her residency. Her record is a matter of public record.

4. **Exhibit E** — In her final reference letter, Dr. Lewis clearly states that I had "successfully" completed all of my rotations — which is a fact. I had also received excellent evaluations, in particular for my skills in patient care and had successfully passed all of my board exams on first take. (Exhibits Ea and Eb document final exchanges between my attorney, Mr. Popick and the hospital attorney, Mr. Hawkins.)

5. **Exhibit F** — Immediately after leaving UVM Health Care, I sent out letters to every single psychiatry residency program in the country, looking for a vacancy. To no avail. After that, I

spent the next five years applying to programs all over the country (see Exhibit F e-mail from the National Resident Matching Program (NRMP)) — even in specialties other than psychiatry: family medicine and pathology; I spent several months shadowing fellow physicians in those fields (at the Holyoke Health Center and at Cooley Dickinson Hospital) in preparation for potential interviews.  I was told (informally) by several residency directors that they preferred recent medical school graduates.

6. **Exhibit G** — This is a typical example of a list of my job searches, before the beginning of an academic semester. I look for anything and everything: from teaching ESL to working in high schools as a substitute teacher.

7. **Exhibit H** — This shows my most recent employment experience: I was offered several courses to teach for Fall 2020 as an adjunct. However, due to current circumstances and the seniority of other instructors, these offers were suddenly retracted weeks before the beginning of the school year. Fortunately, the Dean of the College was appreciative of my organizational skills and temporarily (just for this semester) offered me a non-teaching administrative position to oversee the complicated machinations of a semester that involves both "face-to-face" and online teaching across several departments.

8. **Exhibit I** — since leaving my residency program in early 2013, I have moved an average of THREE times per year, while paying for a storage unit that contains my belongings. As someone who has, by choice, lived alone for most of my adult life, it is not easy living with strangers. There have been drunkards, folks who were not respectful of noise level, situations that were 'summer only', and folks who decided to sell their house on several occasions, etc..

I will be 51 years old in October and I am very much living like a vagrant — hoping against hope to find employment and housing that feels more or less stable, so that I can remove my belongings from storage and begin to live like maybe I belong somewhere. I don't focus on the fact that I've had a passion for an unusual line of work that I worked very hard for, and that was unfairly taken away from me (presumably to open room for another resident in crisis!) — leaving me practically destitute, both financially and sometimes emotionally. I do my best to live day by day and try to contribute some good in whatever small ways that I am able. Luckily, I have a profound appreciation for simplicity.

If I had the means, I would have taken the UVM Medical Center to court and made them pay dearly for their dysfunctional operations — in the same way that my predecessor did. I did not have the means then and I do not have the means now. (However, I was fortunate enough to have found the attorney — Hobart Popick — who had successfully represented Shari Young; and he proved to be a real helping hand.)

But I do hope that there is better JUSTICE — at the very least, in terms of having decent folk recognize clearly the presence of gross misconduct and injustice and how it has wrecked a once promising career. I would appreciate it if the Department of Education would stop pursuing me for the repayment $600,000 that perhaps the University of Vermont rightfully ought to pay on my behalf.

Sincerely,

Tamara Parvizi, MD

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MASSACHUSETTS - SPRINGFIELD

===============================

| | |
|---|---|
| IN THE MATTER OF: | . Case #18-30578 |
| | . |
| TAMARA SARA PARVIZI, | . Springfield, Massachusetts |
| | . **September 29, 2020** |
| Debtor. | . 10:20 A.M. |

===============================

| | |
|---|---|
| PARVIZI, | . |
| | . |
| Plaintiff, | . |
| | . |
| v. | . AP #19-03003 |
| | . |
| U.S. DEPARTMENT OF EDUCATION | . |
| (GREAT LAKES BORROWERS) | . |
| | . |
| Defendant. | . |

===============================

## TRANSCRIPT OF ZOOM TRIAL RE:
### COMPLAINT TO DETERMINE THE DISCHARGEABILITY OF DEBT
### BEFORE THE HONORABLE ELIZABETH D. KATZ, J.U.S.B.C

**APPEARANCES**

For Herself:                           TAMARA SARA PARVIZI, *Pro Se*
                                       45 Schoolhouse Road
                                       Amherst, Maryland  01002

Electronic Sound Recording Operator:   Laura L. Chambers

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

## CASCADE HILLS TRANSCRIPTION, INC.
5001 Woodland Hills Drive, Eagle, Nebraska 68347
(503) 871-5566 ~ Email:  hagerruthann@aol.com

*Page 2*
*#18-30578*
*AP #19-03003*
*September 29, 2020*

APPEARANCES (Continued):

For the U.S. Department of Education:        RAQUELLE KAYE, ESQ.
                                            U.S. Attorney's Office of District of
                                              Massachusetts
                                            U.S. Department of Education
                                            John Joseph Moakley Federal Courthouse
                                            1 Courthouse Way
                                            Suite #9200
                                            Boston, Massachusetts  02210

Electronic Sound Recording Operator:   Laura L. Chambers

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

## CASCADE HILLS TRANSCRIPTION, INC.
5001 Woodland Hills Drive, Eagle, Nebraska 68347
(503) 871-5566 ~ Email:  hagerruthann@aol.com

# I N D E X

*Closing Argument by Ms. Kaye, page 54*
*Closing Argument by Ms. Parvizi, page 59*

| **WITNESSES** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|---|---|---|---|---|
| TAMARA PARVIZI | | | | |
| By the Court | 6, 50 | | | |
| By Ms. Kaye | | 42 | | |

| *Exhibits:* | *Ident.* | *Evid.* |
|---|---|---|
| Stipulated Facts I and II | 4 | 4 |
| Mr. Parvizi's Exhibits 1 through 15 | 5 | 5 |
| Defendant's Exhibits 1 through 11 | 5 | 5 |

Electronic Sound Recording Operator:   Laura L. Chambers

**Proceedings Recorded by FTR Gold Digital Recording**
**Transcript Produced by Certified Transcription Service**

**CASCADE HILLS TRANSCRIPTION, INC.**
**5001 Woodland Hills Drive, Eagle, Nebraska 68347**
**(503) 871-5566 ~ Email:  hagerruthann@aol.com**

1  (At 10:20 a.m.)

2  (Ms. Parvizi very difficult to hear, indiscernibles were

3  unavoidable.)

4          THE CLERK:  Case #19-3003, *Parvizi v. United States*

5  *Department of Education*, file on a complaint to determine the

6  dischargeability of debt.

7          Judge, we have appearing by video a *pro*

8  *se* debtor/plaintiff, Tamara Parvizi, and Attorney Raquelle Kay,

9  who is representing the U.S. Department of Education.  We have

10  a number of attorneys from the United States Attorney's Office

11  observing -- who will be observing the conference by audio

12  only.

13          THE COURT:  Thank you, Mr. Reynolds.

14          Good morning.  I have next to me – you'll see me

15  looking to the side because I have the documents up on my

16  screen.  I'm looking at the final pretrial.  Can you both give

17  me a thumbs up that you can -- if you can hear me okay?  Thank

18  you.

19          So there's a lot of stipulated facts so that was –

20  that's very helpful to the Court, so I will accept as evidence

21  in the case the stipulated facts which I note are Roman Numeral

22  I and I believe there's a Roman Numeral II.

23      ***Stipulated Facts I and II Admitted Into Evidence***

24  Roman Number I has a lot of sub-parts to it.  Okay.  Yes – oh,

25  no.  There's part -- oh, so there's Roman Numeral I with (a)

1 through -- (a) through (h) -- oh, and then (I).  I'm sorry.  I

2 mistook the (I) for another Roman Numeral.

3         So (a) through (I) are the stipulations.  Roman

4 Numeral II a statement of contested facts and then the

5 summary of the case was Roman Numeral III.  So as to the

6 stipulated facts, Roman Numeral I we will consider as admitted.

7         So now what I need to discuss with the parties is any

8 objections to exhibits.  So as I look at this pretrial the

9 plaintiff has a number of Exhibits 1 through 15, so I'm going

10 to start of ask this backwards.  Attorney Kaye, do you have

11 objections to any of Ms. Parvizi's exhibits?

12         MS. KAYE:  I do not, Your Honor.

13         THE COURT:  Okay.  So those will be considered

14 admitted.

15         ***Plaintiff's Exhibits 1 through 15 Admitted***

16         However, I will tell you, Ms. Parvizi, unless you

17 actually point out the relevance of a document I'm not going to

18 independently go reading through things, okay.  And you're

19 going to have to actually -- as you testify, you'll just have

20 to just tell me why they're important.

21         Now, to you, Ms. Parvizi, the Department of

22 Education, the Defendant's Exhibits 1 through 11, do you have

23 any objections to any of their exhibits?

24         MS. PARVIZI:  I do not.

25         THE COURT:  You do not.  Okay.  So those will also be

1  considered admitted.

2  ***Defendant's Exhibits 1 through 11 Admitted Into Evidence***

3  But the same admonishment to you, Attorney Kaye; you need to

4  tell me why it's relevant or tell me, you know, what it helps

5  prove for your case.

6  Am I correct, Ms. Parvizi, the only witness you have

7  is you?

8  MS. PARVIZI:  That is correct, yes.

9  THE COURT:  And Attorney Kaye, at this point you

10  don't have any witnesses?

11  MS. KAYE:  That's correct, Your Honor.

12  THE COURT:  Okay.  So because you don't have an

13  attorney to question you, Ms. Parvizi, I'm going to let you

14  give me a statement of whatever your testimony is that you'd

15  like me to consider and then Attorney Kaye has the opportunity

16  to cross-examine you.

17  Is everybody ready to go?  Give me a thumbs up if

18  you're ready.  Okay.  So we're going to proceed to trial.  And,

19  Ms. Parvizi, I need you to raise your right hand.

20  **TAMARA SARA PARVIZI, Sworn**

21  THE COURT:  Okay.

22  **EXAMINATION**

23  **BY THE COURT:**

24  Q.  Ms. Parvizi, go ahead.

25  A.  Okay.  So my very first exhibit is my resume, which I

1 will share with you right now.

2     Q.   Okay.

3     A.   (Inaudible) do that.  There we go.  Are you seeing

4 that?  Is that --

5     Q.   Yes.

6     A.   Okay.  Great.  So this is just a little introduction

7 about me and who I am.  I graduated from Clark University as an

8 undergraduate.  I studied philosophy and chemistry.  I went to

9 medical school.  I have a master's degree in public health and,

10 you know, I just -- the reason why I mentioned what my majors

11 were, is because I've always had a passion for the mind/body

12 relationship and that is why I went to medical school, to enter

13 a profession that would allow me to professionally help people

14 with that -- you know, with that context in mind, the

15 relationship between mind and body.

16       So upon completion of medical school psychiatry

17 seemed like a civil (phonetic) choice for me, clear path to

18 pursue.  And prior to that I had also a different pallet

19 (phonetic) here on resume.  I had done (indiscernible) medical

20 school with a world renown researcher in the field of mine

21 (indiscernible) basically the concept of my (indiscernible) and

22 mental health care as we know it.  So a real landmark

23 researcher, a great opportunity that I had for a couple of

24 years to work with him to get my master's in public health

25 between state (indiscernible).

1    So when it came time to applying to my residency in

2 psychiatry I had a couple choices.  I had a fairly good chance

3 of getting into a program in Brooklyn.  It's where I was

4 living.

5    THE COURT:  I'm going to interrupt you for one second

6 because on my screen the picture of you is quite small.

7    MS. PARVIZI:  Yeah.

8    THE COURT:  So if I could ask you to stop sharing

9 screens so that I could see you in full size that would be

10 better for me to just listen to what you have to tell me.  Go

11 ahead.

12    MS. PARVIZI:  And so when I applied for residencies I

13 was saying that I had a pretty good chance of entering a

14 residency program in Brooklyn where I was living and where I

15 had completed my medical school rotations, my third and fourth

16 rotations.  I had done quite a number of them in psychiatry in

17 the surrounding hospitals in Brooklyn.  Had done a very good

18 job, had great recommendations.

19    Nevertheless, in the process of application the

20 program -- the residency program director at the University of

21 Vermont, Dr. Judy Lewis, became very interested in me and she

22 recruited me in what we would term quite aggressively, you

23 know, sending me emails and telling me, you know, how much she

24 appreciated the work that I had done at the University of

25 Massachusetts, you know, how lovely it would be if I went

1 through the program, et cetera, and I gave into that.

2          You know, during the match you have to rank the

3 programs that you are interested in going into and against my

4 previous plans I ended up ranking the University of Vermont as

5 my number one choice.  And of course, I'll never know if that

6 was right or wrong because, you know, there's no way to know

7 how the Brooklyn hospitals ranked me at this (phonetic).

8          Regardless, so moving along with my narrative here, I

9 went to the University of Vermont in (indiscernible) program

10 and, you know, felt that I had made a good choice.  You know, I

11 felt that the -- the psychiatric cases that I would think there

12 would be pathology tests and what I (indiscernible) there, you

13 know, there were a lot of social issues that are -- present

14 themselves (indiscernible).

15          So from a -- strictly from a training point of view,

16 I felt that I made a very good choice and received really

17 excellent recommendations in the three or four-month period

18 that I was there from attendings sending emails to both me and

19 Dr. Lewis saying how impressed they were by me, et cetera.

20          Shortly thereafter she started calling me into her

21 office to talk to me about issues that when I shared them with

22 my fellow residents the feedback was, "Well, that's unusual.

23 Why would she talk to you about coming to a medical student,

24 particularly when the feedback they gave to the medical student

25 was not out of the ordinary in the mistake that they made and

1 gave them offers back, et cetera?  You know, why would that

2 (indiscernible)?" or why would it have been an issue that the

3 patient -- "a patient" who is a malingerer, basically a liar,

4 for whatever reason presents themselves repeatedly to the

5 emergency room with no real medical issue, why would

6 discharging such a patient be an issue for her.

7       Several things like this came up that I detailed in

8 one of my exhibits here that I'd like to present to you.  And

9 basically what I have here is the (inaudible) so I will share

10 this screen with you if necessary.

11       THE COURT:  Do you recall which exhibit of yours it

12 is?

13       MS. PARVIZI:  Let's see.

14       THE COURT:  In terms of a letter?

15       MS. PARVIZI:  Yes, Exhibit C.

16       THE COURT:  Exhibit C.  Okay.  Thank you.

17       MS. PARVIZI:  Is that clear to everybody on the

18 screen?

19       THE COURT:  We can see it, your screen.

20       MS. PARVIZI:  So I have detailed here the rebuttal

21 that I gave to her, the medication (phonetic) plan.  So

22 suddenly, you know, taking me completely by surprise she called

23 me into her office one day and I have -- I was (inaudible)

24 modification plan, you know, and this is the (indiscernible).

25 This goes before the committee, before a residency

1  (indiscernible).

2          And so my rebuttal, (indiscernible) plan summarizes

3  pretty well what the points were against me.  There were

4  performance deficits but there was nothing that was severe

5  enough to compromise patient care.  Here that I started my

6  residency program could be Irene (inaudible) out of 12 -- about

7  11-type hits.  I was -- and I completely destroyed (phonetic)

8  the mental residency hospital for that (indiscernible) of

9  Vermont.  And so suddenly there's (inaudible) where normally

10 chronic patients at that setting were now released in the

11 community and for constant (inaudible), you know, to our

12 services (inaudible).  And four residents are here and the one

13 intern on call, you know, per night.

14          It was just an extraordinary situation, you know, to

15 handle not only the inpatient, not only the incoming, but also

16 the sedation of that (indiscernible) patients who have been

17 released from state hospital, you know, constantly working

18 (inaudible).

19          So, you know, some of the complaints were not

20 (indiscernible) but nevertheless decided to first put them on

21 the mediation (indiscernible).

22     Q.  Do you have a way to make your speaker a little bit

23 louder?  Sometimes you're a little bit hard to hear.

24     A.  Oh, I am -- I am -- yeah.  I will try to speak a

25 little bit louder.

1       Q.    Oh, that's -- that's 100 percent better.

2       A.    Is that better?  Oh.

3       Q.    Whatever you just did.

4       A.    Okay.

5       Q.    Please go ahead.

6       A.    And so some of the other complaints that I mentioned

7    to you about the medical student, which is detailed down here,

8    you know, and discharging a malingering patient.  And then

9    there was another case where it wasn't a case related to a

10   patient but it was a case related to -- would it be helpful if

11   I just went down here?  Maybe I'm rushing this too much.  I

12   feel like we have limited time, but I should not feel that way.

13      Q.    You don't -- yeah, you shouldn't rush.

14      A.    Okay.

15      Q.    And don't assume that I know --

16      A.    Okay.

17      Q.    -- everything that you're presenting --

18      A.    Yes.

19      Q.    -- because I don't know at the top if this is just a

20   letter to you --

21      A.    Right.

22      Q.    -- or who is this from and I also don't know a time

23   frame.  So if you can tell me those things first.

24      A.    Sure.  So thank you for saying that because I feel

25   like I'm rushing.  I don't want to take –

1      Q.   Don't rush.

2      A.   So this was written around -- this rebuttal around

3  November of 2012.  So I started to in June of 2012 so this is

4  not long after the beginning of my – of my tenure as president

5  with (indiscernible).

6           So this is the first complaint that she had was for

7  performance deficit, that I was not good at (indiscernible)

8  procedures, but yet these are procedures that they were updated

9  constantly.  So, you know, and other residents were also

10 (indiscernible) about it.  And, in fact, just prior to her

11 complaint had a meeting to try to clarify this issue for

12 everyone.  So the fact that she is (indiscernible) deficit of

13 finding particular it is -- the whole of a crisis for her.  I

14 put this a criticisms from one of the attendings and what I

15 said in my rebuttal was that I don't feel that it's my place to

16 try to practically be clear about this type of admission from,

17 you know, a center -- what a psychiatric center would propound

18 (phonetic) but that essentially (indiscernible) about.  I can

19 have other residents.  They also applied (indiscernible)

20 admission (indiscernible) your position and they didn't think

21 it's always (indiscernible).  There's always a point you

22 otherwise would like (indiscernible).

23          So, you know, I think her complaint was, why did the

24 crisis workers -- it's like, well, it's not my responsibility

25 to ask and not -- not it would be, you know, but a senior

1 licensed worker, Cheon (phonetic), went (indiscernible)

2 she clearly knows what she wants to meet.  That's none of my

3 business.  But they have a bond and that's their business.  But

4 again, that's listed as a shortcoming of mine.

5 　　　　　Returning pages in a timely manner.  This happened

6 only once many weeks ago during a supervised meeting.  I'm

7 missing a word there with the senior resident from the medical

8 school that accidentally turned my finger alarm off while

9 trying to adjust other functions.  I am not aware of any other

10 and certainly no one has given me any feedback about this

11 problem.

12 　　　　　So again, these are -- I'm not pulling these out of a

13 hat.  These were specific rebuttals that addressed the first

14 specific complaint about me.

15 　　　　　Morning signout.  In the first, second meeting with

16 the doctor that had told me that Sanchit (phonetic) was a

17 senior resident, I reported to her that I was effectively late

18 from (indiscernible).  I noticed that they had a prior hardship

19 (indiscernible) for residents never came to (inaudible).  I

20 asked -- I simply asked (indiscernible) for another inpatient

21 or resident fully.  My impression was that Dr. Lewis learned

22 about the possibility that I might frankly betray another

23 resident rather than expressing my genuine conclusion of being

24 reprimanded.

25 　　　　　Again, but I -- what -- I'm -- I take issue with that

*Tamara Parvizi - By the Court*

1  myself.  I should not have (inaudible), so I absolutely do not

2  (indiscernible) that.

3         Taking longer than other residents stuck (phonetic)

4  and my response was, well, I vowed to being thorough and I

5  don't think that this is an item that without any prior

6  feedback -- any -- no one had told me prior to getting this

7  mediation plan that that was a problem for -- you know, getting

8  feedback on how to do better and giving me an opportunity to do

9  (indiscernible) right out of the (inaudible) in writing

10  (inaudible) the litigation (inaudible).  It deserves to be

11  presented before the Education Committee at this point in time,

12  too.

13         Dr. Lewis (indiscernible) regarding orders.  That's

14  specifically with regard to direct transfers from the court.  I

15  am now very clear about this because it says something that,

16  you know, I was getting feedback on showing how to do it

17  appropriately, properly and I followed through.

18         But again, she felt that it was appropriate for her

19  to present this before an entire academic committee in a

20  mitigation (phonetic) plan prior to consulting with me giving

21  me feedback and then watching me (indiscernible) which is what

22  training is all about.  That's why it's called a training

23  program.

24         Shall I (indiscernible), by the way, of

25  (indiscernible) senior resident was (inaudible).  Both doctors

Case 19-03003   Doc 149   Filed 10/05/21   Entered 10/05/21 11:47:55   Desc Main
Document    Page 50 of 97
*Tamara Parvizi - By the Court*

Page 16

1  (indiscernible) resident (indiscernible) early acknowledged

2  that not providing good signout is a universal issue at times

3  with all residents, not specific to me.  However, this is

4  definitely something I am working on.

5          Appropriate use of attending physician.  My

6  understanding is that this is a direct (inaudible) regarding a

7  malingering patient, although Dr. Pierattini (phonetic), who is

8  the chairman of the department, did not think this was a

9  problem.  I acknowledged that I needed to be more aware of

10  this, communicate with the attending and if the outpatient care

11  (inaudible).  This is the first time that this had come up

12  (phonetic).

13          And in my rebuttal I picked out the letters that at

14  no time prior to (indiscernible) patient plan were by informed

15  (indiscernible) resident that there was any performance steps

16  on my part whatsoever and I'm sure there were.  I just hope

17  (indiscernible), but again, not addressed to me in the -- sort

18  of a constructive criticism at all.

19          And her next complaint is Roman Numeral I for all my

20  performance techniques.  That's it.  And then Roman Numeral II

21  her accusation was that I miscorrected that and that I

22  fabricate and she essentially accused me of having cognitive

23  issues of -- which is a pretty serious accusation.  So all

24  those (inaudible) one at a time.

25          Of all the medical students that I've worked with

Case 19-03003   Doc 149   Filed 10/05/21   Entered 10/05/21 14:47:55   Desc Main
Document   Page 51 of 97
*Tamara Parvizi - By the Court*

Page 17

1 only two, in my opinion, required feedback about not

2 (inaudible).  A third-year medical student without knowledge of

3 a conversation between (indiscernible) like health, regarding

4 medication (inaudible) had proceeded to have this conversation

5 (indiscernible) after the fact (indiscernible) sensitive issue

6 (inaudible).

7           I asked this if it might go into some medication

8 issue like (indiscernible) patients in general, check

9 (indiscernible) or with myself or doing so in the future.  So

10 that was not a problem.  You know, this medical student

11 obviously a very important (indiscernible) issue and that would

12 be (indiscernible).

13           Next came -- this was after her, a fourth-year

14 medical student on its big part to take care of admission when

15 he had introduced himself at the initial interview, I would

16 still go (inaudible) information.  He had been seen in the

17 emergency department for suicidal ideation earlier a couple

18 nights before, had been sent home with it twice.  And then the

19 next day after he had been sent home from the ER had

20 (indiscernible) and was now admitted (inaudible) and this is

21 the patient that the medical student was (inaudible) talking

22 first.  I walked into the room to find the medical student

23 extracting the details of the patient's first visit emergency

24 room when he had been discharged and the circumstances under

25 which he had been discharged.

*Tamara Parvizi - By the Court*

1   Later in the privacy of the conference room I

2   discussed with the student why exploring this topic – this

3   entire topic with this patient and (indiscernible) was

4   completely inappropriate.  I also discussed with him why in a

5   new patient on his own for the first time on Shep 6 (phonetic)

6   before the core -- you know, your cases might be potentially

7   dangerous.  He seemed to appreciate the criticism and I was

8   satisfied with (indiscernible).  I had no intention of

9   mentioning the situation to anyone else.  I've been in intense

10  (indiscernible) have a complaint against (inaudible) director

11  of the medical students' location.  You know, I thought he's

12  mature enough, yes, that good enough.

13   Also, apply what I had learned from Medical Student A

14  from above during my orientation with the new incoming medical

15  student and on the first day I told them they need to be aware

16  of this medication which is (indiscernible).  So, you know, as

17  I'm learning -- as I'm learning how to deal with, you know,

18  medical students I'm applying what I'm learning with -- you

19  know, as I move forward basically.

20   So on 9/14/12 -- on September the 14th, Dr. Lewis had

21  a meeting with me, first by annual thing that she likes to have

22  with her (inaudible).  She checked in with me about my living

23  situation, et cetera.  The one and only feedback I got from her

24  at this meeting was that a medical student -- this is Medical

25  Student B -- had complained about my having been harsh with

1 them.  I explained to Dr. Lewis that certain (inaudible)

2 regarding inappropriate topic of discussion with a suicidal

3 patient and she agreed with my rationale for having expressed

4 my concern with the medical student.

5          According to the mediation plan, and I later

6 discussed this -- this subject, she apparently had the second

7 medical student, a student – she apparently had the second

8 medical student deny the topic of our conversation and she

9 apparently went back and had a conversation with that medical

10 student, even though she's not even the director of the medical

11 (inaudible) at this point.  She apparently went back to him and

12 talked with him and the student apparently conferred the night

13 the topic of our conversation.

14          Apparently, as I'm finding out for the first time

15 from meeting Dr. (Indiscernible) litigation document, his main

16 concern had been about what I had said during my orientation

17 regarding his stocking medication issue for suicidal patients.

18          So apparently that's what he told her, that he didn't

19 have a problem with me giving him feedback about talking with

20 the suicidal patient.  You know, he was offended by the fact

21 that I had asked Dr. Penn (phonetic) what -- you know, his

22 entire core board (phonetic) of medical students careful about

23 discussing, you know, medications with (inaudible).

24          Recently on 10/18, so this is the day of – a month

25 later, Dr. Lewis talking about the student had also

Case 19-03003   Doc 149   Filed 10/05/21   Entered 10/05/21 14:07:55   Desc Main
Document    Page 54 of 97
*Tamara Parvizi - By the Court*

**Page 20**

1  (indiscernible) suggestion of having him in with her and myself

2  to clarify the situation.  It seems like Dr. Lewis then

3  concluded that the student was being honest, that I was the one

4  being dishonest.  I mean, that was her conclusion, that there

5  was a discrepancy in what I'm saying was there, even though it

6  seemed like it wasn't even denying the fact that he and I had

7  had a meeting.  He just was offended at something else.

8        And when Dr. Lewis first told me, "Oh, a medical

9  student has complained about you," my assumption was, "Oh, he

10 must have complained about the other situation."  I'll leave it

11 for you to figure that one out, you know, but he, you know,

12 asked me if (indiscernible).  I was just (inaudible) probably

13 on right now about why this (inaudible).

14        So my plan to sort of, you know, get down on my knees

15 basically and ask for forgiveness for a situation that I'm not

16 even clear on is from now on if I have any (indiscernible)

17 medical certificate, I will coordinate the issue with

18 Dr. Noriette (phonetic), who is the director of the

19 (inaudible).

20        Situation here was a short call which is from 4:00

21 p.m. to 8:00 p.m., a four-hour (inaudible) four-hour

22 (inaudible).  The attending on call was a Dr. Altoff

23 (phonetic).  I've presented (inaudible) 4:00 p.m. and that's

24 what is called the short call (indiscernible) overnight call

25 would go up at 8:00 and they would be on call for the following

1 12 hours.

2          So -- and there was a rule with interns, which is

3 what I was, which is basically that you cannot be on call for,

4 you know, a certain amount of time.  You know, that's why

5 perhaps he had to go home at 8:00 otherwise he (indiscernible)

6 violation of the rules of the time limit of how long the

7 (inaudible) on duty as an intern.

8          So at 8:00 p.m. I -- and while this is going on there

9 is no attending in the hospital, so you are on the phone with

10 psychiatrist on call so (indiscernible) with him sometime after

11 8:00 p.m.  You know, of course, they drag on so, you know,

12 (inaudible) knowing that there were two new admissions

13 waiting -- two new psychiatric admissions (inaudible) and I

14 told them, "I will call you later to present one admission,"

15 because there was a lot to leave for the incoming overnight

16 residents.  It's a lot to handle.

17          And Dr. Altoff told me, "No, it's after 8:00 p.m. and

18 you go home.  Those are the (inaudible)."  I reminded him that

19 there are two admissions (indiscernible) both (indiscernible)

20 go home.

21          Meeting number two with his 1-8 (indiscernible)

22 September, Dr. Lewis and the chief resident explained that the

23 night float resident had had a very difficult night and why had

24 I not offered to help him.  She wondered about my work ethic.

25 I explained to her my exchange with Dr. Altoff which she was

1  able to confirm.  The next day I sent an email to the night

2  float who was (inaudible) cc: that the float -- you know, cc:

3  the message to go to Dr. Lewis expressing my regret for not

4  having offered correctly any additional help.

5        In the rare mediation plan Dr. Lewis contested that

6  during the 9/28 (indiscernible) occur and the resident, I told

7  them that I often helped (indiscernible) directly.  He claimed

8  that I did not.  I am simply saying that, in fact, I made his

9  comment to Dr. Altoff and not (indiscernible) and that's why I

10  submitted an email apologizing to him for not -- regardless of

11  what Dr. Altoff said that he's at least -- at least -- I don't

12  know -- at least said, "Hey, I hope that (inaudible)," as

13  reflected by my email to him the following day and I reported

14  my email here (indiscernible).  I sent it.  "I just wanted to

15  drop a line and say how sorry I am about that awful

16  (indiscernible) time.  Please know that if I had known better,

17  his life would have been a little easier (indiscernible)" and

18  this again despite the fact that the attending asked me to go

19  home in no uncertain terms.

20        My plan is to always be sure to ask the fellow

21  resident coming on call whether they knew that he helped

22  somebody (phonetic).  See what's a nursing like from

23  (indiscernible) weekend off and again held a meeting with

24  Dr. Lewis.  Dr. Lewis (indiscernible) left with the complaint.

25  I got a call from the inpatient (indiscernible) nurse sometime

1 between 6:00 and 7:00 p.m. telling me that there might be a

2 situation -- problem basically with the people who are patients

3 and what medications (inaudible). And I have (indiscernible)

4 phone call.

5       And so the weekend when I'm on call and again, I'm

6 all by myself. Nobody else was there. And again, this is in

7 the context of the consequences of the mental state hospital

8 having been destroyed on top of it (phonetic).

9       I asked them when the last dose of his standing

10 medication had been given. He told (indiscernible) in the

11 computer and to sign out when, in fact, several times I told

12 him to find the correct information (indiscernible) decisions

13 on what to give the patient and that on the (indiscernible). I

14 never heard back from him.

15       An hour later when I went back to the inpatient floor

16 everything was quiet, however, (indiscernible) I signed out

17 (indiscernible) and the nurse in question followed me out and

18 at that point I turned to him and I apologized if I had been

19 sharp with him regarding medications. You know, I think this

20 is the precise information (indiscernible). He seemed to

21 accept my apology and also understood the importance, from my

22 point of view, of having the correct information.

23       Later a nurse who was not on duty or present at the

24 time of the above incident, Chelsea Cordner (phonetic), filed a

25 complaint against me. According to Dr. (Indiscernible), Nurse

1 (indiscernible) I never asked to call me back.  However,

2 according to Nurse Cordner, Alexander Johnson just

3 (indiscernible) comfortable calling me back.  And this is why I

4 mentioned in my rebuttal that when I went to Shep 6 (phonetic),

5 everything was quiet and there were no altercations or

6 emergencies.  I mean -- and also I mentioned he was a new

7 nurse.

8          I mean, you know, you don't tell yourself when you're

9 a professional what you would like to have a patient, you know,

10 somebody asked me to give them precise information about

11 medication.  I wasn't able to like go bad (phonetic) about it

12 and now I don't know (indiscernible) calling this resident

13 back.  Although they typically asked -- he called them back to

14 tell me what's going on, I wasn't comfortable.  That is not --

15 and I had certainly apologized to him and I know I'm within my

16 rights to ask (inaudible).  I don't think I'd done anything

17 wrong.  But nevertheless --

18      Q.   So Ms. Parvizi, I'm going to interrupt you right now.

19      A.   Yeah.

20      Q.   As you're speaking, the audio is not good at all.

21      A.   Okay.

22      Q.   I'm able to follow because you're essentially reading

23 the document so you've gotten through --

24      A.   Oh.

25      Q.   -- page 4 out of 7.  Is there any way that you can go

1  to an inside location?

2      A.   Oh, let me try.  Let me try.  Hang on.

3      Q.   And let -- go ahead.  I'll just wait.

4      A.   Yeah.  I am so sorry.  I woke up this morning and

5  found the neighbors doing, you know, a major project in their

6  yard with trucks and everything, so it was just horrendous is

7  why I came out here.  I'm sitting in a place that's a little

8  more sheltered and hope that maybe this will improve the audio.

9  Oh, okay.

10      Q.   Okay.  We'll give it a try.

11      A.   We'll give it a try.  Okay.

12          When I -- so after this incident with the nurse I --

13  she had a meeting with me and I suggested to Dr. Lewis, you

14  know, maybe it would be better in the future if as soon as I

15  get a call from the in-patient floor maybe I should just drop

16  everything and run to the floor.  And she says, "No, no, that's

17  not necessary.  You have to use your judgment, you know, decide

18  whether, you know, you should go there or not."

19          It seems that in this case my judgment was correct,

20  you know, that I decided not to drop everything and run to the

21  floor because, you know, the nurse had clearly indicated there

22  might be an escalation.  You know, it wasn't a sure thing and I

23  also asked them to call me back if there was a problem, which

24  he never did.

25          So, you know, my judgment was not off.  It seemed

Case 1:19-03003   Doc 149   Filed 10/05/21   Entered 10/05/21 14:07:55   Desc Main
Document    Page 60 of 97
*Tamara Parvizi - By the Court*

**Page 26**

1 that in this case my judgment was correct, there was no need

2 for medication or my presence.  But Dr. Lewis -- but

3 Dr. Lewis's concern is for the discrepancy in what she heard

4 from me versus from a nurse who was not even involved in the

5 situation.  So my plan was I reviewed emergency procedures with

6 a senior resident with this case.

7         Case D, there was an emergency department case of a

8 malingering patient.  The attending with Dr. Chigpuntam

9 (phonetic).  One collateral source had provided information

10 regarding malingering.  I called Dr. C and we had a half-hour-

11 long conversation about the intricacies of this -- of

12 discharging malingerers.  During this conversation I expressed

13 to him my great discomfort confronting this patient with my

14 collateral information, which was that he's a malingerer.

15 Here, a potential risk of harm to the collateral source,

16 meaning the patient's friend.  I did not feel safe telling him,

17 "Hey, here's your friend who told us that, you know, you're

18 basically lying to him."

19         Dr. Chig -- Dr. C; I'll call him Dr. C -- told me,

20 "This is an interesting case and you'll have to figure out how

21 to go about discharging this patient now, especially since you

22 already told him we have a bed available for him," which

23 unfortunately I had none.  Dr. C asked me to call the pharmacy

24 indicated on his medication to confirm the correct number of

25 pills and call him back.  I made this call only to find out

Case 19-03003   Doc 149   Filed 10/05/21   Entered 10/05/21 14:47:55   Desc Main
Document   Page 61 of 97
*Tamara Parvizi - By the Court*

**Page 27**

1  that the source wasn't in fact an admitting (phonetic) mental

2  health facility in Ohio.  The pharmacy was closed.

3      However, they informed me that they could offer

4  additional information about this patient with the release of

5  information.  I obtained a release form from the patient, faxed

6  it to this facility, and I was able to perform the confirmed

7  information provided by the first collateral source, which was

8  the patient's friend.

9      As there was no further new information to convey to

10 Dr. C and he had already discussed about discharging a

11 malingering patient, I began a process of discharging.  I met

12 with three security guards and began discussing how I would

13 approach the patient with the PA Matt Solver (phonetic).

14     As we were having the discussion, an ED attending who

15 was familiar with the case because he came through often told

16 me, "I wouldn't go into any details with this patient.  Just

17 tell him there are no beds and we will hold onto his medication

18 in the emergency department and he can follow up with crisis

19 tomorrow if he wants to."  This is the emergency department

20 attending.

21     So I follow his directions and then called Dr. C for

22 closure.  He was very upset, Dr. C.  He said that I should have

23 confronted this patient with the collateral information and

24 perhaps he could have admitted if he began again acted

25 violently because if he now goes out and hurts himself, we will

1  be liable.

2           Dr. C was also upset that the crisis clinician who

3  was accompanied by her supervisor as she was still in training

4  had left long ago.  This is another case where a crisis worker

5  has left.  After information from the first collateral source

6  had been obtained, he informed me that the present clinician

7  should have stayed and participated in the discharge process

8  with the PA and myself.  I was not aware of it.  Later that

9  night from home I contacted -- I contacted the on-call crisis

10 clinician and updated him about this case.

11          The next day on the 15th I left a message with

12 Dr. Lewis very concerned because, you know, Dr. C being so

13 concerned about discharging a malingering patient, even though

14 it was going fully with the advice of the emergency department,

15 you know, attending whose show it is basically -- it's his

16 department, you know -- I left a message with Dr. Lewis very

17 concerned asking to meet with me further to discuss this case.

18          However, that morning before I had a chance to hear

19 back from Dr. Lewis I had a seminar with Dr. Pierattini

20 (phonetic), who's the chairman of the department.  Afterward,

21 in light of the fact that there had been a recent and extensive

22 discussion about ownership of patients in the ED, i.e., who,

23 you know, ownership in terms of here's a psych patient but, you

24 know, does the psychiatric department own this patient or does

25 the ED department own this patient, you know, versus crisis.  I

1   approached him for his view on this particular case.  I was

2   very concerned about whether or not I had done the right thing

3   following the ED attending's suggestion about discharging the

4   patient without any further discussion with him about his first

5   collateral or (indiscernible).

6        Dr. Pierattini, again, the chairman of the

7   department, told me that there was no single right way to go

8   about dealing with malingerers and there was nothing wrong with

9   following an ED attending's suggestion in this case.

10        I met with Dr. Lewis's meeting number four with her

11  to discuss this case.  I felt that it wasn't my place to either

12  defend or blame the crisis clinician, especially since she was

13  under direct supervision.  Her own supervisor was there with

14  her, but I did express regret that I was not entirely aware of

15  the rules and regulations with regard to this particular

16  matter.  I have been faulted in the performance deficit section

17  for this lack of awareness.  "Fran (phonetic), I need to be in

18  contact with on-call attending at every developing stage of a

19  case."  So, you know, I should have called Dr. Chigpuntam and

20  told him, "Hey, you know, the ED attending has asked me to

21  discharge this patient with no further questions, no further"

22  and he once had said basically in like four other cases and I

23  discharged them.  "You know, I'm going to discharge them.  What

24  do you think?"  You know, that's essentially the plan.  That's

25  what I'm saying.

1          So that is the gist of it.  That is what this is all

2   about.  And so at this point after I wrote this rebuttal I was

3   told that there is an ombudsman at the hospital, you know --

4       Q.   I can't hear you again, Ms. Parvizi.

5       A.   Oh, oh.

6       Q.   Hold on.  Let me make you louder if I can.

7       A.   Okay.

8       Q.   Okay.  Try that again.  After this, then what

9   happened?

10      A.   After this -- you know, I was told that there is an

11  ombudsperson at the hospital whose job it is to basically

12  mediate when there's conflict and I clearly felt that there was

13  a lot of conflict suddenly starting to happen between myself

14  and Dr. Lewis for cases that seem to, you know -- you know,

15  certainly worth discussing but not worth punishing somebody

16  for.  You know, these are cases that are worthy of having as a

17  basis for training somebody professionally, not for punishing

18  them, which is what essentially she was doing.

19          So I went to the ombudsperson and presented this

20  entire document to him and her complaint and said, you know,

21  basically she's not so much concerned with the particular

22  cases, it seems.  She's more concerned -- she's saying

23  basically, "You're saying one thing and I'm hearing something

24  else and you must be lying.  You must -- basically you must

25  have cognitive defect," is her conclusion.

1      And his suggestion was basically "Why don't I be

2  present?" And his name was Dr. Robert McColly (phonetic), who

3  was also on the ethics commission and was the hospital

4  ombudsperson. And he said, "Why don't I be present during any

5  meeting that you ever have with Dr. Lewis again and then that

6  way there can be a witness so that she cannot say you said this

7  and then later on said, no, I heard this or somebody else said

8  this and, you know, use that as a claim against you. You know,

9  maybe if there's a witness then things will go better." And I

10 jumped at that opportunity. I said, "Absolutely. That would

11 be great, but it seems like that is the problem."

12      And so after this point whenever Dr. Lewis wanted to

13 meet with me I would let Dr. McColly know and he would show up

14 and he would be there. It was not comfortable. Obviously it

15 did not improve dynamics with her because she did not like that

16 obviously, but there were no more complaints after this. And I

17 said, you know, "Whatever you want me to do, let's do it. You

18 know, you want me to go -- you know, keep going through my

19 rotations and meet with you, you know, after every rotation,

20 which is basically after every four to five, six weeks, I'm

21 happy to do that and Dr. McColly will be there and, you know,

22 and that's that." You know, and then once we do that, the

23 terms of the mediation plan will be taken care of basically,

24 know. It will be like, you know, "I basically remediated, I

25 addressed all your concerns and we're good to go forward from

 1  here."

 2          Well, in January Dr. McColly went on a year-long

 3  sabbatical to England.  He left the country in January and as

 4  it turned out I was working -- I had just started working on

 5  the floor for one of my rotations under the direct supervision

 6  of Dr. Lewis in (indiscernible).  And literally within the

 7  week -- within a week after I started working on the floor,

 8  days after Dr. McColly had left the country and no one was

 9  there to be present between -- you know, basically acted

10  arbiter between me and her, she found an excuse to basically

11  put me on a leave of absence and that's when I asked for a

12  hearing.

13      Q.   I'm sorry, that's when you asked for what?

14      A.   A hearing.  A hearing before --

15      Q.   Okay.

16      A.   -- a committee to basically bring up all these

17  concerns and say, "I am being treated unfairly.  I should be

18  trained, but I'm not being trained.  I'm being punished

19  essentially."  And let me just -- so this is the end of this

20  exhibit.

21      Q.   Okay.

22      A.   And so this is an email that I sent to my attorney at

23  this time.  So at this time I started looking around for legal

24  advice and, lo and behold, I found out that -- and this is

25  going back to Exhibit B, which is that in 2011, just a year

1 before I began my residency in this program, there was a

2 Dr. Young, another psychiatric resident, who had sued the

3 department, which is essentially the hospital, for breach of

4 contract.  And she ended up getting herself a jury trial and

5 winning one of the biggest civil lawsuits in Vermont history

6 apparently.  And this is a website from Longrock Sperry & Wool,

7 which is a legal firm in Burlington, Vermont, who represented

8 this psych resident in this same program.

9         So she brought a suit for breach of employment and

10 she won her case.  And one of the -- Popick -- Mr. Popick, one

11 of the attorneys who represented her is the attorney who I was

12 fortunate enough to find in my search to try to protect my

13 career and fight a battle against, you know, basically being

14 railroaded is what was happening here and what I felt like was

15 happening here.

16         And so he took on my case.  And this is a letter

17 that -- an email that I sent to him in March which is match

18 time.  March is when the match happens and if you want to go

19 into residency program, a training program, that's where --

20 that's when you find out where you go.

21         Now, at the end of the match there are usually open

22 spots where there hasn't been a match, you know, between

23 residents and training program and so that's an opportunity for

24 residents to reach out directly to residency programs and say,

25 how about we strike a deal, and that's usually -- that's

1  traditionally been called "the scramble" because you're

2  scrambling.  Both the programs and the residents are scrambling

3  to find a match outside of the official match, which has

4  already taken place, and the time frame varies every year, but

5  it's always in March.

6          So this is an email that I sent to Hobart (phonetic),

7  who is Hobart Topic (phonetic).  I just wanted to be clear on

8  an important point that should be helpful.  This past week is

9  what is called the scramble, ID any open positions left after

10 the final residency match, which took place this past Monday,

11 are up for grabs.  And during this time programs have to make

12 rapid decisions to make sure their slots are filled by Friday,

13 which is that day of the email.

14         And since appeals hearing never took place, you know,

15 I -- appeal hearing took place and there was no resolution and

16 the appeal hearing did not take place as it was supposed to.

17 In their own by-laws they say, we will give you a hearing

18 within four weeks of your request for a hearing.  Those are the

19 hospital rules and they basically broke their own rules and

20 never got back to me four weeks after I asked for a hearing.

21         So had I had the hearing I would have known that the

22 resolution wasn't my situation.  You know, at that point I

23 would have -- potentially I was hoping for a positive result

24 for myself so that I could have reached out to these open spots

25 in these programs and said, hey, this is what's happened here

1  and, by the way, it's been resolved in my favor and I would

2  love to come and serve you; how about that; but there was no

3  resolution even after four weeks.

4         So therefore, I still don't know exactly what Judy

5  Lewis would say about me.  I decided to sit the scramble out

6  rather than risk not only a negative outcome but a prejudicial

7  report that might follow me into next year's application

8  process.  Needless to say, I considered this a very serious

9  damage that's a direct consequence of not having had an appeal

10 on time.  Of course, the outcome of the appeal could have been

11 unfavorable to me but then, again, we don't know.

12        So in summary, I just missed my best chance of

13 finding another position somewhere else.  My only option right

14 now is to send out letters to every single program in the

15 country, which I did, asking them to keep me in mind in case

16 there's an unanticipated opening as soon as we settle things

17 with (indiscernible).

18        All things considered, I really think the best way to

19 go about this -- to go about that is to agree to appoint

20 someone besides Judy Lewis to discuss my case with prospective

21 program directors because clearly, you know, she has nothing

22 nice to say about me.

23        I also think that if I don't find a position by July

24 1st, which is very likely, Fletcher Allen ought to consider

25 paying for that damage given their breach of contract and the

 1  consequences of that.  It adds up to my being one year out of a

 2  training program or one year late in starting my career.  "I

 3  look forward to hearing your response," you," et cetera.

 4          So this is another email sent to Mr. Popick on

 5  July 2nd.  So I'll jump to the second paragraph:

 6          "I recently heard from interesting news about the

 7          aftermath of my sign-up and thought you might be at least

 8          amused to know about it.  It turns out that the resident

 9          who Judy Lewis hired to replace me is a woman who was

10          fired from another residency program, Huff (phonetic) I

11          believe, from prescribing narcotics and benzodiazepines

12          for herself.  In fact, she has a public record of being on

13          disciplinary action easily accessed on Google."

14          This is from the Massachusetts Medical Disciplinary

15  Board.

16          "And even now at Fletcher Allen she regularly has to

17          interrupt her work in order to submit urine samples.

18          Apparently she was a medical student at UBM and was known

19          to Dr. Lewis and, therefore, a known quantity.

20          "I am still unemployed and very much in search of a

21          job here in the Connecticut/New York area, but at least

22          I'm a little more hopeful as far as finding another

23          residency position for next year.  "Well, here we are in

24          2012 and I have not found a residency program."

25          I have knocked on every door and not just on -- you

1  know, on psychiatric programs which is what my passion is for,

2  but family medicine and pathology.  And I even spent time in --

3  at the Holyoke Health Center and at the Emily Dickinson

4  Hospital following the pathology department attendings trying

5  to prepare myself for potential interviews that I might have

6  for family medicine, for pathology residency programs and,

7  again, those never (inaudible).

8          I'm sorry.  I'm just going to go grab a tissue.  I'll

9  be right back if that's okay.

10     Q.   That's all right.

11     (Pause)

12     A.   So I guess the next series of exhibits --

13     Q.   You're still pretty -- it's a little bit difficult --

14  it's better than it was before.

15     A.   Okay.

16     Q.   And I can tell that you're -- you seem to be holding

17  whatever the device is.  Is there any way for you to put it on

18  a table and then speak closer to it?

19     A.   Sure.  How's that?

20     Q.   It's the same really.

21     A.   It's the -- I'm sorry.  Are you not able to see me

22  prop -- well?

23     Q.   I can see you fine.  Let me just do this.  Okay.

24  It's -- I see you fine.  I see your screen fine.  It's just

25  that the -- the audio is quite soft.

 1      A.   It's quite soft.  I'm not sure what else to do.  I'm

 2 going to try to speak a lot louder now.  I'm sorry.  I got

 3 choked up before.

 4      Q.   Yeah.

 5      A.   I'm almost done with my presentation --

 6      Q.   Okay.

 7      A.   -- so it's sort of the biggest part of it.  The

 8 other --

 9      Q.   Okay.

10      A.   -- thing that I want to present is this series of --

11      Q.   I couldn't hear that last piece.

12      A.   Oh.

13      Q.   I heard something about one percent.

14      A.   Yeah, the last thing that I want to present is a

15 series of email confirmations about my job applications just

16 from last summer.

17      Q.   Okay.

18      A.   So what I've been doing basically since leaving my

19 residency program is that I have been teaching as an adjunct.

20 I'm not sure if everyone here knows what an "adjunct" is, but

21 an adjunct is basically an instructor at a college, usually

22 community colleges, where you don't have any kind of stability,

23 no guarantee of a job from semester to semester.  You know,

24 they hire you to teach courses with no benefits and basically

25 you get the scraps of what's left at the, you know, end of all

1  the senior instructors picking whatever courses they want to

2  teach.

3        So that's what I have been doing and also working in

4  schools as a substitute teacher.  You know, needless to say, I

5  mean, after -- I think what I should also go back to is an

6  email from the National Residency Match Program, the NRMP,

7  which is basically an email saying, you have applied; yeah, we

8  can confirm that you have spent the last five years applying to

9  residency programs and never got admitted, a single one.  And I

10  will also add that I never got an interview either.  So that is

11  one of the exhibits that I can pull up, an email from NRMP

12  confirming the fact that I didn't just sit on my butt after

13  this happened.  You know, right afterwards I sent out emails to

14  every single --

15        THE COURT:  Hold on one second.

16        Let me ask, Mr. Reynolds, can you turn your video

17  back on and your audio and let us know how you're finding it?

18        THE CLERK:  Not great.

19        THE COURT:  Okay.

20        THE WITNESS:  Okay.  Let me see.  Where can I go?

21  You know --

22  **BY THE COURT:**

23    Q.  Yeah, right now I can't -- I couldn't you at all, Ms.

24  Parvizi.

25    A.  Okay.  Could you maybe (inaudible) --

 1      Q.   Why don't I -- it's 11:20.

 2      A.   Yes.  Yeah, maybe give me a chance to run home and

 3   maybe this -- this -- this business with the trucks and

 4   everything is over at home and I can just continue at home.

 5      Q.   So I'm -- obviously I don't know where you are right

 6   now.  How much time do you need to travel to that other

 7   location?

 8      A.   About ten minutes.

 9           THE COURT:  Okay.  So it's 11:20 now.  I just want to

10   give it plenty of time.  So Mr. Reynolds, what do you think?

11           THE CLERK:  Judge, I think if we were able to take a

12   15-minute recess --

13           THE COURT:  Great.

14           THE CLERK:  -- that might be good for everybody and

15   that would allow Ms. Parvizi a little bit of breathing room --

16           THE COURT:  Okay.

17           THE CLERK:  -- to get back where she needs to.

18           THE COURT:  So I'm going to leave the Zoom open,

19   Mr. Reynolds, but obviously I'm going to step away.  Okay.

20           THE CLERK:  All right.

21           THE COURT:  So we'll take a 15-minute recess.

22           MS. PARVIZI:  Okay.  Thank you so much.

23           THE CLERK:  All right.  Ms. Kaye, would you prefer

24   that I send you to the conference room with your colleagues or

25   do you want me to leave you where you are?

 1         MS. KAYE:  If you could put me in the conference room

 2 that would be great.

 3         THE CLERK:  Okay.  Just to everybody who's listening,

 4 I am going to -- you should all be getting invitation to join

 5 the conference room.  Please accept that invitation and I will

 6 close the conference.

 7         MS. KAYE:  Thank you.

 8         **(Off the record at 11:44 a.m.  Back on the record at**

 9 **12:10 p.m.)**

10         THE CLERK:  Okay.  Can you hear me now, Ms. Parvizi?

11         THE WITNESS:  (No audible response.)

12         THE CLERK:  No, okay.  Okay.  Did -- there's

13 something -- I can't hear you either.  Can you check the --

14 hold on.  I've got you coming in again.  Maybe this is going to

15 make the difference.  Okay.  Ms. Parvizi, can you hear me

16 now -- well, actually you're muted on your end, so you need to

17 unmute.  Okay.  It looks like you unmuted yourself.  Can you

18 hear me okay now?

19         THE WITNESS:  I can hear you okay now, yes.

20         THE CLERK:  Okay.  And we can hear you, too.  So what

21 I'm going to do is invite everybody else to come back in.  Your

22 video is freezing up in increments.  Yeah.  It looks like it

23 keeps freezing.

24         THE WITNESS:  Okay.  Give me just a second, okay?

25 Hang on.

Case 19-03003 Doc 149 Filed 10/05/21 Entered 10/05/21 14:07:55 Desc Main
Document Page 76 of 97
*Tamara Parvizi - Cross*

**Page 42**

1        THE CLERK:  Do you have the option?

2        (No audible response.)

3        I just started recording again.  I don't know how

4   long, quite honestly, we have not been recording this.

5        THE COURT:  Okay.  Well, I do know that since the

6   break Ms. Parvizi went through her Exhibits G and H in detail

7   and then had argument, which as I mentioned is more appropriate

8   for closing anyway.  So to the extent to try to make the record

9   complete, that is what happened from our last break until now.

10  And then Ms. Kaye had barely started.  So Ms. Kaye is going to

11  start asking questions and we'll go from here.  Thank you,

12  Attorney Kaye.

13        MS. KAYE:  Thank you, Your Honor.

14        Good morning, Ms. Parvizi.  I'm going to ask you a

15  few questions.  I understand that we're on Zoom today so if at

16  any point you can't hear me, see me or understand what I'm

17  saying, just let me know.

18        MS. PARVIZI:  Good, thank you.

19                     **CROSS-EXAMINATION**

20  **BY MS. KAYE:**

21    Q.   So, Ms. Parvizi, you estimate your monthly expenses

22  total approximately $1600 per month, correct?

23    A.   Correct.

24    Q.   And those expenses consist of payments for your rent,

25  your storage unit, car insurance, renter's insurance, your cell

 1  phone and groceries, correct?

 2       A.   Correct.

 3       Q.   And they also include $200 per month in what you

 4  describe as "discretionary spending," correct?

 5       A.   Correct.

 6       Q.   And, Ms. Parvizi, you would describe your income as

 7  variable, correct?

 8       A.   Very correct, yes.

 9       Q.   But even with this variability you do have periods of

10  time or you have income to spend after accounting for your

11  $1600 and monthly expenses, correct?

12       A.   Correct.

13       Q.   Ms. Parvizi, in the fall of 2018 you earned

14  approximately $4,000 per month from August through December,

15  correct?

16       A.   Correct.

17       Q.   And your expenses at that time were approximately

18  $2,000 per month, correct?

19       A.   Correct.

20       Q.   And that left you with approximately $2,000 per month

21  in discretionary income, correct?

22       A.   Between what periods again?

23       Q.   In the fall of 2018 from August through December.

24       A.   Correct.

25       Q.   And you did not save any of that money during that

Case 19-03003   Doc 149   Filed 10/05/21   Entered 10/05/21 14:07:55   Desc Main
Document    Page 78 of 97
*Tamara Parvizi - Cross*

Page 44

 1   period, correct?

 2       A.   Correct.

 3       Q.   And you do not recall how you spent that money,

 4   correct?

 5       A.   I mean, discretionary is -- I'm not sure where you

 6   get the word "recall."

 7       Q.   You don't remember what you spent the money on

 8   specifically --

 9       A.   Did you ask me?

10       Q.   -- your discretion?

11       A.   Have you asked me that question and I've said that I

12   don't recall?

13       Q.   Ms. Parvizi, do you recall what you gave a deposition

14   in this case on December 19, 2019?

15       A.   Yes, correct.

16       Q.   And, Ms. Parvizi, at that deposition do you recall

17   that you stated that you don't remember how you spent your

18   $2,000 --

19       A.   No, I mean --

20       Q.   -- discretionary income during that time?

21       A.   -- they're in my bank statement.  I mean, recall --

22   you know, I would have to look at my bank statement to see

23   because, you know, I mean, I don't -- I only have one bank

24   statement, which is Bank of America.  As you know, I don't have

25   any other bank statements.  So everything -- pretty much every

Case 19-03003   Doc 17-9   Filed 10/05/21   Entered 10/05/21 11:47:55   Desc Main
Document    Page 79 of 97
*Tamara Parvizi - Cross*

**Page 45**

1 thing goes into and out of that one account, so I may not

2 recall specific individual expenses or -- you know, withdrawals

3 that I've made, but everything is on record.

4     Q.   Okay.  And you did not make any student loan payments

5 during that period, correct?

6     A.   No, absolutely not, no.

7     Q.   Okay.  Ms. Parvizi, for the two months beginning

8 June 12, 2019, through August 13, 2019, you spent over $1500

9 at clothing stores, household gift shops, and on Etsy.com,

10 correct?

11     A.   Um-hum.  Possibly, yes.

12     Q.   And Ms. Parvizi, for that same two-month period

13 beginning June 12th, 2019 through August 13, 2019, we spent

14 over $900 on meals out, coffee and Amazon and Paypal purchases,

15 correct?

16     A.   Possibly, yes.

17     Q.   And during that same two-month period you did not

18 make any student loan payments, correct?

19     A.   Correct.

20     Q.   And Ms. Parvizi, you voluntarily signed up for your

21 student loans, right?

22     A.   Correct.

23     Q.   And Ms. Parvizi, you are unwilling to participate in

24 an income based or payment plan, correct?

25     A.   Correct.

1      Q.   But based on your current income you could afford to

2   pay $80 per month, correct, towards your student loans?

3      A.   No.  No.

4      Q.   But you admit you spend more than $80 per month on

5   discretionary purchases, correct?

6      A.   Is it okay -- I'm sorry, I'm not a legal person.  Is

7   it okay if I elaborate on my answer?

8           THE COURT:  You just need to answer the question.

9           THE WITNESS:  Okay.

10          THE COURT:  And if you can't answer the question,

11  then you need to say, "I can't answer that question."

12          THE WITNESS:  Okay.  I can't answer that question.

13  **BY MS. KAYE:**

14     Q.   And Ms. Parvizi, since 2014 other than applying for

15  residencies you have not sought other work in the medical

16  field, correct?

17     A.   Well, as I said, I sought work as a program manager

18  for various research programs in 2013 and into 2014 and all of

19  them without success, yes, so I gave up after awhile.  I

20  mean ...

21     Q.   Okay.  And Ms. Parvizi, you stated at your deposition

22  that you felt that jobs like being a phlebotomist or a medical

23  assistant were not as dignified a way to use your knowledge as

24  some of the other work you were trying to pursue, correct?

25     A.   I mean, I'm qualified to teach.  I have a good basis

Case 19-03003    Doc 149    Filed 10/05/21    Entered 10/05/21 14:07:55    Desc Main
Document    Page 81 of 97
*Tamara Parvizi - Cross*

**Page 47**

1  of scientific knowledge, biology in particular, and that's what

2  I've been doing and I enjoy doing it.  I feel like I'm making a

3  positive contribution to, you know, training future nurses in

4  particular and other healthcare workers and I feel like I've

5  suffered enough of a loss that I deserve a sense of dignity in

6  terms of knowing that I'm doing something that's -- that I

7  consider worthwhile.

8       Q.   And Ms. Parvizi, do -- you would agree with me that

9  you have not sought to maximize your income, correct?

10      A.   I mean, you know, I've never considered myself -- I

11  didn't go into medicine to make money.  You know, maybe this is

12  naive but I -- you know, at this point I'm feeling like

13  maybe -- maybe hopefully I think the Mass College of Pharmacy.

14  I don't know.  You know, I'm beginning to find maybe some sort

15  of foothold so that I can have some sense of stability.

16          But in terms of maximizing my income, I mean, how

17  else would you want me to do that?  I mean -- I mean, the only

18  way I'm hoping to do it is by hopefully finding a stable

19  teaching situation.  That's what I'm looking for.  I mean, we

20  all have goals, right?  That is my goal at this point.

21      Q.   Okay.  And so just to clarify, it's your view that it

22  just doesn't matter to you how much money you make, correct?

23      A.   That's exactly right, yeah.  No, I mean, as long as I

24  can live more or less comfortably, you know, and, you know, I

25  haven't taken a vacation anywhere in years.  You know, I mean,

Case 19-03003    Doc 149    Filed 10/05/21    Entered 10/05/21 14:07:55    Desc Main
Document    Page 82 of 97
*Tamara Parvizi - Cross*

**Page 48**

1 I'm -- yeah, I mean, I'm a pretty humble person, I would say.

2 You know, outside of -- you know, I don't have kids.  I

3 specifically never wanted children because I feel, you know, a

4 simple existence is a good existence.  So I think I would say

5 the money that maybe I could have spent all these, you know,

6 discretionary funds somebody could have spent on a child

7 possibly, I mean, you know, I'm spending on -- a little bit on

8 myself.  I think it's okay to not have a family and not have a

9 career and at least, you know, take care of yourself a little

10 bit and not extravagantly.  I don't think 15, $1600 is an

11 extravagant sum during a two or three-month period to spend on

12 one's self considering what I could have spent had all this not

13 happened to me.  Not only would I have paid back my student

14 loans but maybe -- maybe I could have bought, I don't know,

15 $200,000 house or something.  I don't live like that.  I rent

16 rooms.  That's how I live.

17     Q.   And Ms. Parvizi, you do not believe you should be

18 required to repay your student loans, correct?

19     A.   Yes, because this is clearly a case of I -- I

20 believe, in fact, there is a law on the books for excusing

21 payment of student loans based on whether you've been

22 bamboozled out of your education, out of your -- some kind of

23 training and I hope that I've proven my case that I have been

24 cheated in no uncertain terms --

25     Q.   Ms. Parvizi, I don't mean to interrupt you, but --

1      A.    -- out of my --

2      Q.    -- it's a yes-or-no question.

3      A.    Yeah.

4      Q.    Thank you.  And just one final question, Ms. Parvizi,

5  just to be clear, you have never once made a single voluntary

6  payment towards your student loan debt, is that correct?

7      A.    That is correct, yes.

8           MS. KAYE:  Okay.  Thank you.  No further questions,

9  Your Honor.

10          THE COURT:  Thank you, Attorney Kaye.  Well, as I

11 mentioned, you're going to need to point me to whatever you

12 want me to look at.  I'm not just going to read Ms. Parvizi's

13 bank statements unless you're pointing them out to me, Attorney

14 Kaye.  So do you want to go ahead and do that or is it just the

15 stipulated facts that maybe that's what you're hoping I'm going

16 to go by?  Attorney Kaye?

17          MS. KAYE:  Yes, Your Honor, thank you.  Yes, the

18 stipulated facts include all the information that you would

19 necessarily glean from the exhibits, as well as the testimony

20 that Ms. Parvizi just gave now on cross, so those are the two

21 things --

22          THE COURT:  Okay.

23          MS. KAYE:  -- that you would need to read.

24          THE COURT:  Okay.

25          MS. KAYE:  From the Government's perspective.

1          (Pause)

2          THE COURT:  So -- okay, Attorney Kaye, you don't have

3  any other questions, then?

4          MS. KAYE:  No, Your Honor.

5          THE COURT:  Okay.

6                              **EXAMINATION**

7  **BY THE COURT:**

8     Q.   Ms. Parvizi, did you want to say anything else?  I'll

9  let you say anything else you want to say.

10    A.   Oh, sure.  So I guess since we weren't being recorded

11 earlier, maybe for the sake of the record --

12    Q.   Sure.

13    A.   -- I'll repeat what I said before.  Kaye is --

14 actually, one of the exhibits that Attorney Kaye showed at the

15 very beginning, which was from 2007, which was my offer to --

16 and thank you for showing that, by the way, Attorney Kaye,

17 because that was an exhibit that I had asked of you, but I did

18 not use it myself.  But this is -- this was $45,000 that I had

19 offered to the Department of Education as sort of a settlement,

20 if you will, and this -- I had basically "inherited."  Even

21 though my father was still alive at the time, he had sold a

22 piece of land that he had and I have two other siblings and my

23 mother, and so the profit that he made from the sale of that

24 land amounted to $100,000 that came to me.

25          And so out of that $100,000 was $45,000 that I

 1  offered to give to the Department of Education.  This was for a

 2  master's degree that I had loans from before and so on.  So

 3  just to say, I have not taken out student loans in bad faith,

 4  you know.  Even when I had a little bit of -- not a little

 5  bit -- you know, $100,000 to me is a lot of money.  You know, I

 6  was willing to part with half of it in payment of loans, though

 7  I just want to (inaudible) --

 8        Q.   You --

 9        A.   I have made every effort (inaudible) --

10        Q.   Hold on.  You froze up.  Hold -- just repeat the very

11  last phrase.  I got you most of the time.

12        A.   Oh, okay.  Well, I want to say that I have made every

13  effort to recover my profession that was a calling for me.  You

14  know, that's been a passion for me.  It's not just something I

15  went into and decided to do because the hours are good or, you

16  know, you can make money doing it.  Those were not my motives.

17            I -- what was taken away from me in such an

18  outrageous manner by a program -- a residency program director,

19  who I consider a sociopath and who was a liability to her own

20  hospital for having lost a major lawsuit to a resident before

21  me and she continues to be there which is unbelievable, you

22  know, and some of the actions that she's taken.  Despite all of

23  that, I just want to say in good faith and in -- you know, in

24  respect to my own sort of integrity of what I want to do with

25  my life, I've knocked on every door.  I tried everything to try

1   to regain what was taken away from me and in the process

2   obviously be able to pay back these student loans.

3           I mean, it's never been my intention to not pay these

4   back.  I mean, are you kidding me?  Why would you not?  I mean,

5   if they -- you know, I'm not going to make the argument that,

6   well, you know, there are other countries where, you know,

7   nobody takes out loans and, you know, and here we are living in

8   a state where the President of the United States doesn't pay

9   his taxes and, you know, et cetera, et cetera, we're not going

10  to go there.  We're not going to go there.

11          I'm just going to say I'm a decent human being and I

12  have had every intention of holding up my end of the bargain as

13  far as student loans go and I would just --

14      Q.   Why wouldn't -- let me ask you this question,

15  Ms. Parvizi, because I -- I did read the stipulation and you

16  briefly for 12 months entered the income-based repayment

17  program and then failed to fill out of a form --

18      A.   Well --

19      Q.   -- and during that whole 12 months your payment was

20  zero dollars.  So why are we here today and you're unwilling --

21      A.   Well --

22      Q.   -- to enter that income-based repayment program?

23  Please answer that question.

24      A.   Yeah.  Because I guess after a conversation with

25  someone at that time and after some thinking on my own, I

Case 19-03003    Doc 149    Filed 10/05/21    Entered 10/05/21 14:07:55    Desc Main
Document      Page 87 of 97
*Tamara Parvizi - By the Court*

**Page 53**

1 realized why should I pay for the mistakes of a residency

2 program director whose behavior has cost me my life, my pursuit

3 of happiness.  Let's put it that way.  Why should I pay for

4 that person's mistake?  I mean, the hospital paid for her

5 mistakes once months before I entered that program and here I

6 am.  You know, why should --

7       Q.    But why is it the fault of the Department of Educa --

8       A.    Why should I pay for her mistake?

9       Q.    Ms. Parvizi, but why is that the fault of the

10 Department of Education?

11      A.    Well, isn't there something called loan repayments

12 that -- there is a law, is there not -- are you not familiar

13 with this where the Department of Education forgives loans that

14 have been taken out by people like at Trump University and

15 places that were clearly, you know, not in violation of

16 something, like they weren't even accredited institutions and

17 yet they took student money and basically left them with

18 something that -- what's really worthless.

19           I think I'm trying to make a similar argument, I

20 guess.  I'm trying to say that what I -- what I was going

21 through, what -- this is from an accredited university, an

22 accredited training program, but the way that I was dismissed

23 from my training was completely outrageous, like insane, not --

24 you know, no pun intended, but completely insane.  I -- why

25 should I be beholden to pay back for money that was supposed to

1 be put towards my training that was not in a way that just had

2 left everyone that hears the story completely baffled, what the

3 hell happened here?

4      Q.   Okay.  Well, I do know about the cases that you

5 talked about --

6      A.   And I set this --

7      Q.   -- where some private colleges --

8      A.   -- (indiscernible) will.  Yes, exactly, and --

9      Q.   I'm sorry?

10      A.   And so -- that's right.  I think we're talking about

11 the same thing and I think that's all I want to say.  I'm

12 sorry.  Yeah.

13      Q.   Okay.  I don't think your situation is the same as

14 that situation.  I think the standard is -- Attorney Kaye is

15 going to tell me the second is whether repayment would cause

16 you an undue hardship and that's what I'm going to listen to

17 Attorney Kaye in her closing argument.

18           THE COURT:  So Attorney Kaye, go right ahead.

19                **DEFENDANT'S CLOSING ARGUMENT**

20           MS. KAYE:  Thank you, Your Honor.  Raquelle Kaye on

21 behalf of the Department of Education.

22           Your Honor, the only question we need to answer today

23 is whether requiring Ms. Parvizi to repay a portion of her

24 federal student loan would cause an undue hardship.  The answer

25 is plainly no.  Ms. Parvizi owes the Department of Education

1   more than $650,000 for loans used to fund her education.  She

2   has received a bachelor's degree, a master's degree in public

3   health, and is a doctor of medicine.  By her own admission she

4   has no physical or mental health problems and no dependents.

5            In 20 years Ms. Parvizi has not made a single

6   voluntary payment toward her student loans.  The evidence

7   reflects that Ms. Parvizi's refusal to make payments towards

8   her student loans began long before her issues with her

9   residency program.

10           As Ms. Parvizi stated in her closing, in 2007, the

11  year before she began medical school for the second time, she

12  received a $100,000 inheritance.  At the time her student loans

13  to date were in default and she owed approximately $123,000.

14  She offered DOE $45,000 to compromise the debt.  When DOE

15  refused because based on her financial circumstances they

16  believed she had the ability to pay, she not only failed to use

17  any of those funds to repay her student loans, she sent a

18  letter to DOE threatening to leave the country to avoid

19  repaying.  The following year Ms. Parvizi made the decision to

20  return to medical school and take out additional loans to do

21  so.

22           Ms. Parvizi's experience with her residency program

23  is not what anyone would hope for.  It was no doubt and it's

24  very clear that it's very difficult for her to see her dream of

25  practicing as a physician come to an end.  She clearly feels

1  that she did not get the benefit of her bargain and that may

2  certainly be true when it comes to the University of Vermont,

3  but that is not the case when it comes to the student loan she

4  received from the Department of Education.  She applied for a

5  loan, DOE gave her the money.

6         To the extent Ms. Parvizi blames her current

7  financial situation on her inability to complete her residency

8  program, it was ultimately her choice to seek additional

9  education and in doing so to assume additional student loan

10  debt.  Moreover, if Congress intended to make the repayment of

11  student loans contingent on certain events, it would have done

12  so.

13         The Court again is required to look at the totality

14  of circumstances and Ms. Parvizi's focus on her residency

15  program is misplaced.  The evidence reflects that Ms. Parvizi

16  has a history of substantial discretionary spending.  For five

17  months in the fall of 2018 Ms. Parvizi had approximately $2,000

18  per month in discretionary income.  She did not, however, save

19  any money during that period and did not use any of those funds

20  to repay her student loans.

21         Ms. Parvizi's bank statements show that she spends

22  significant amounts each month at clothing stores, household

23  gift shops and on Etsy.com.  For example, over the two months

24  beginning mid-June 2019 through mid-August 2019 she spent over

25  $1500 on such items.  This does not include amounts she spends

 1  on eating out, getting coffee or Amazon or Paypal purchases,

 2  which total an additional more than $900 during that same two-

 3  month period.

 4         If Ms. Parvizi enrolled in a repay and can base her

 5  payment program, her monthly payments based on her income would

 6  be approximately $80 per month.  In 2019 she spent almost 15

 7  times that amount on discretionary purchases in one month

 8  alone.  In 2020 Ms. Parvizi has earned discretionary income

 9  ranging from $400 to $1800 per month.  Even with her variable

10  income after making an $80 payment, Ms. Parvizi would have

11  approximately $300 to $1700 per month to spend or save as she

12  chooses.

13         DOE is only asking her to contribute a small fraction

14  of that discretionary income to her taxpayer funded debt.  If

15  Ms. Parvizi is unable to maintain the same level of income next

16  year her payments will decrease accordingly and could be as low

17  as zero dollars per month and still count towards her repayment

18  obligation.

19         At the end of the program the debt will be

20  discharged, regardless of whether there's any outstanding

21  balance due.  One cannot reasonably conclude that asking

22  Ms. Parvizi to enroll in an income-based repayment program and

23  repay some portion of her student loans would create an undue

24  hardship.

25         In closing, Your Honor, Ms. Parvizi has not shown

```
 1  undue hardship.  She simply does not feel she should have to

 2  repay her student loans and that is not a sufficient basis for

 3  this discharge.  Thank you.

 4          MS. PARVIZI:  I have a question for Attorney Kaye.

 5  So you keep coming back to last summer -- my having spent $1500

 6  during last summer.  Are you -- are you -- I've submitted all

 7  my financial records to you.  You can -- oh, I

 8  can't (inaudible).

 9          (Pause)

10          THE CLERK:  You're still muted, Judge.

11          (Pause)

12          THE CLERK:  It's still mute.

13          (Extended pause)

14          THE CLERK:  Okay.  Judge, I sent you a request that

15  might make a difference.  Okay.

16          THE COURT:  Okay.  Can you hear me now?

17          THE CLERK:  Yes, we can.  Thank you.

18          THE COURT:  Okay.  Thank you for stopping even though

19  you couldn't hear me.  Excuse me.

20          You're not permitted, Ms. Parvizi, to ask questions

21  of --

22          MS. PARVIZI:  Okay.

23          THE COURT:  -- Attorney Kaye.  However, I'm going to

24  give you the opportunity to say what you want to say in

25  rebuttal.  As I recall, you were talking about your summer
```

1  expenses and so what do you want me to know about that?

2  ***PLAINTIFF'S CLOSING ARGUMENT***

3      MS. PARVIZI:  Well, last year was one year where last

4  spring I was -- you know, I made more in tutoring in -- through

5  the Northampton Public School System more than I normally do

6  and so I had a little bit more in discretionary funds at that

7  time.  So I just want to say that that is not, you know -- I

8  don't do that -- normally spend, you know, $1500 in

9  discretionary funds because, God forbid, that's a lot of money.

10      Also, what I would like to say is that last year I

11  had not just my storage unit but (inaudible) broken into and a

12  number of stuff stolen from my storage unit.  And I just got a

13  call from them last week and this has happened again and I

14  haven't had a chance to even go up and see it.

15      But same deal.  Notices that Greenfield -- some

16  storage unit in Greenfield and there's a police record of it

17  and fortunately I had rental insurance.  I submitted all of

18  those documents to you guys before, Attorney Kaye, to your

19  colleague last year and this has happened again, so --

20      THE COURT:  You froze up for a second, Mr. Parvizi.

21  Were you saying that the storage unit, your items were stolen?

22      MS. PARVIZI:  Yes.

23      THE COURT:  Okay.

24      MS. PARVIZI:  Last year and again just a week ago --

25      THE COURT:  Okay.

1              MS. PARVIZI:  -- today -- this year.

2              So just to say, you know, I mean, $1500, you know --

3     I mean, from a year where I made a little more than I normally

4     do to just buy a few extra things that I feel I needed, I also

5     want to close by saying I'm going to be 51 years old in October

6     and I am well aware of my age and my situation in life right

7     now.  And so going forward from here -- and I'm starting to do

8     this now -- I am -- I need to start putting money away.  I need

9     to start having some kind of saving.  I mean, I'm not 20 years

10    old.  I'm not 30 years old.  I'm not 40 years old.  I'm going

11    to be 51 years old.

12             I mean, to make payments towards $600,000 when I

13    could have paid everything back for -- because I don't have a

14    job, I don't have a security based on -- you know,

15    discrimination.  I'm just going to say it.  Vermont, the

16    University of Vermont, the hospital, they were a handful of us.

17    I am not using this as an exaggeration.  Maybe five in the

18    entire hospital of residents who were non-white.  I'm

19    technically Caucasian but I'm not your typical Caucasian.

20             I mean, that was the first question the attorney

21    asked me, you know, "Would you want to approach this as a

22    racial problem?" and at the same I said no and I still say no

23    because that's just something that's so ugly that I don't even

24    want to be a part of.  But I think if none of the sort of

25    sociopathic attributes of a residency program director of how

1  she went about ruining my career, who she replaced me with, her

2  previous legal problems with another resident, if none of

3  this -- none of this is enough to convince you that I've had my

4  life ruined, that it's okay for somebody who has had their life

5  ruined to spend an extra $1500 at some point that they should

6  maybe put that money towards paying student loans for loans

7  that were taken out for training that never happened, maybe the

8  FBI should investigate sociopaths.  That's what I'm saying.

9  Forget the racial stuff.  Maybe somebody should pick up at some

10  point.  Maybe Congress should consider what happens when you

11  have some woman, some doctor, some person who has two letters

12  after her name and who's been put in charge of a residency

13  program and ends up creating problems for people over and over

14  again, maybe we should look into this rather than pursue the

15  people whose lives have been ruined to pay back $600,000.

16          THE COURT:  Thank you, Ms. Parvizi.

17          Thank you, Attorney Kaye.  So I'm going to take the

18  matter under advisement unless you had anything else, Attorney

19  Kaye.

20          MS. KAYE:  I do not.  Thank you, Your Honor.

21          THE COURT:  Okay.  So I'm going to think about the

22  testimony.  I'm going to read the stipulation more carefully

23  and the exhibits have been submitted.

24          Mr. Reynolds, can I get you back on video just before

25  we hang up?  Okay.  Are we -- we're all set with exhibits,

1 right, at this point? You've got them all?

2          THE CLERK: I have all of Ms. Parvizi's exhibits. I

3 transferred them to hard copy and I was going to ask Ms. Kaye

4 if it is possible for her to send me in the mail hard copies of

5 her exhibits if it isn't a hardship. I don't say that

6 (inaudible).

7          MS. PARVIZI: I'm sorry, I can't hear you,

8 Mr. Reynolds. I missed the last few sentences.

9          THE CLERK: I was asking Ms. Kaye if it's possible

10 for her to send me hard copy versions of her exhibits. If it's

11 a difficulty we can translate them into hard copy. I'm just --

12          MS. KAYE: No, that's no problem at all. I will send

13 those to you today.

14          THE CLERK: Thank you. I'll confirm the mailing

15 address you should use.

16          MS. KAYE: Great.

17          THE CLERK: And I think we're --

18          THE COURT: Okay.

19          THE CLERK: -- set, Judge.

20          THE COURT: I think we're all set, then. The matter

21 is taken under advisement. You can both leave the meeting and,

22 Mr. Reynolds, you can stop recording. Thank you.

23          PARTIES: Thank you.

24 (End at 10:18 a.m.)

25                    * * * * * * * * * * * *

1          I certify that the foregoing is a true and accurate

2     transcript from the digitally sound-recorded record of the

3     proceedings.

_____    10/6/2020

**RUTH ANN HAGER**
**Certified Transcriber**
        **Federal C.E.R.T. **D-641**
**CASCADE HILLS TRANSCRIPTION, INC.**
5001 Woodland Hills Drive
Eagle, Nebraska 69347
(503) 871-5566
Email: hagerruthann@aol.com